**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

THOMAS BRYANT,

                         Plaintiff,

            v.                               No. 9:18-CV-494
                                                   (GTS/CFH)

CHRISTOPHER MILLER, et al.,

                         Defendants.

_____

**APPEARANCES:**                        **OF COUNSEL:**

Thomas Bryant
02-A-5545
Sing Sing Correctional Facility
354 Hunter Street
Ossining, New York 10562
Plaintiff pro se

Attorney General for the                    DAVID A. ROSENBERG, ESQ.
   State of New York                       Assistant Attorneys General
The Capitol
Albany, New York 12224
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

       Plaintiff pro se Thomas Bryant ("plaintiff"), an inmate who was, at all relevant

times, in the custody of the New York Department of Corrections and Community

Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that

defendants Superintendent ("Supt.") Christopher Miller, Senior Counselor J. Scroggy,

_____

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to
28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Sergeant ("Sgt.") D. Coonradt, Sgt. M. Hawk, Corrections Officer ("C.O.") Savage, C.O. Kaiser, C.O. Bogardus, DOCCS Director of Inmate Grievance Program Karen Bellamy, Unit Chief of Mental Health Unit ("MHU") Corey Jackson, Therapist McCloskey, Nurse Practitioner C. Meyers, Risk Management Special Meaghan Bernstein, Executive Director Deborah J. McCulloch, Office of Mental Health ("OMH") Clinical Risk Reviewer James Steed, and OMH Commissioner Anne Marie Sullivan violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Dkt. No. 12 ("Am. Compl."). Presently pending before the Court is defendants' Partial Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 33. Plaintiff opposed the motion, and defendants filed a reply. Dkt. Nos. 44, 47. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

## I. Background

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection II infra. At all relevant times, plaintiff was an inmate at Great Meadows Correctional Facility ("Great Meadows").

## A. First Amendment Claims

Plaintiff alleges that he wears his hair in a dreadlock-style that "reaches the floor either standing up or sitting down." Am. Compl. ¶ 29. At the time of his amended complaint, he had been growing his dreadlocks for approximately twenty-four years. Id.

2

In June 2015, plaintiff entered the mess hall with his hair in a ponytail.  Id. ¶ 30.  After receiving his meal, plaintiff "placed his hair around his waist and sat it in his lap to avoid it from coming into contact with the unsanitary floor" when he sat down.  Id.  An unnamed corrections officer approached plaintiff and informed him that "'he couldn't have his hair like this,' knowing or should have known [sic] to do otherwise would have plaintiff's hair on the floor."  Id. ¶ 31.  Plaintiff did not enter the mess hall again with his hair in a ponytail.  Id. ¶ 32.

On July 14, 2015, C.O. Savage approached plaintiff on his way to the mess hall and inquired about "his hair being wrapped up without a religious hair covering on it."  Am. Compl. ¶ 33.  C.O. Savage gave plaintiff a direct order "'not to come out [of] his cell with his dredlocks [sic] wrapped on the top of his head without a religious hair covering on it' even after plaintiff informed him that he[ was] not religious/Rastafarian."  Id.  Because plaintiff was unwilling to change his religion to Rastafarian in order to wear the religious crown, he remained in his cell as ordered by C.O. Savage.  Id. ¶ 34.  Plaintiff contends that he has previously been disciplined for failing to adhere to DOCCS guidelines regarding his hair.  Id. ¶ 35.  Faced with what plaintiff describes as "Hobson's Choice,"[2] he decided to remain confined in his cell and not change his hairstyle.  Id. ¶ 38.

Later that day, plaintiff filed a grievance as to C.O. Savage's alleged conduct.  Am. Compl. ¶ 39.  On July 16, 2015, plaintiff wrote to Supt. Miller requesting that he

---

[2] Plaintiff describes "Hobson's Choice" as the phenomenon wherein an individual is "damned if he do and damned if he don't."  Am. Compl. ¶ 38.

revoke C.O. Savage's order until the matter was resolved by the inmate grievance program.  Id. ¶ 40.  Supt. Miller did not respond.  Id. ¶ 41.  During his confinement in his cell, plaintiff did not receive mess hall meals, exercise opportunities, or program opportunities.  Id. ¶ 42.  Plaintiff informed his family and friends of his restrictions, and they contacted the facility on his behalf.  Id. ¶ 43.  Plaintiff explained his situation to a nurse from OMH, but she failed to help him.  Id. ¶ 44.  Soon thereafter, Mr. Scroggy and C.O. Savage visited plaintiff, and plaintiff explained the situation concerning C.O. Savage's direct order to remain in his cell.  Id. ¶ 45.  C.O. Savage interjected, stating "we can't just allow inmates to do what they want!"  Id. ¶ 46.  After listening to C.O. Savage and plaintiff describe the situation, Mr. Scroggy told plaintiff that he needed to cut his hair or change his religion to Rastafarian and wear a crown "and this [issue] will go away."  Id. ¶ 47.  Plaintiff alleges that "even when faced with outside agencies inquiring into the well being of plaintiff's health and mind state, [Mr. Scroggy] reit[ ]erated that all plaintiff had to do was cut his hair or change his religion to the Rastafarian faith . . . and this problem would go away."  Id. ¶ 49.  Mr. Scroggy failed to make sure plaintiff received adequate nutrition while confined, but "bartered to end plaintiff's deprivations and punishments in exchange for plaintiff forsaking his sincerely[-]held beliefs not to be religious nor practice the tenets of a religion."  Id.  Sgt. Coonradt, the supervising sergeant of plaintiff's housing unit, conducted an investigation into plaintiff's allegations and listened to plaintiff's complaints of being wrongfully confined for his hair and "religious conformities."  Id. ¶ 50.  Sgt. Coonradt gave plaintiff a highlighted copy of Directive 4914 and told him that C.O. "Savage was

4

right and if [plaintiff] wanted out of this compliance was key."  Id.

## B. Equal Protection Claims

The Inmate Grievance Review Committee ("IGRC") rendered a decision on plaintiff's grievance on August 17, 2015.  Am. Compl. ¶ 50.  The grievance resolution concluded "that Dr. 4914 specifically addressed dredlocks [sic], and instructs that such hair must be tied back, or worn in a crown.  There are no provisions allowing grievant to wrap his hair on top of his head unless it is under a religious crown."  Id. ¶ 51.  Plaintiff disagreed, and appealed the decision to Supt. Miller.  Id.  On September 1, 2015, Supt. Miller denied plaintiff's grievance, "primarily because '[t]he grievant was seeking to wear his dredlocks [sic] wrapped on his head without a religious covering.  This styling is in violation of Directive # 4914.  The Officer was rightfully enforcing Departmental policy."

Id. ¶ 52.  Plaintiff appealed to the Central Office Review Committee ("CORC") regarding

> his deprivations and the discriminatory practices shown
> between similarly situated prisoners of the Rastafarian faith
> with dredlocks [sic] who could practice their beliefs and protect
> their hair by way of wrapping it up with their crowns[,] while
> plaintiff, on the other hand with floor length dredlocks [sic],
> practicing his non-religious beliefs, and seeking the same
> opportunity to protect his hair . . . without a crown is denied[.]

Id. ¶ 53.  Plaintiff alleges that Rastafarian inmates pose a greater risk to security with their dreadlocks wrapped in a crown atop their head than non-religious inmates without the crown.  Id. ¶ 55.  Plaintiff contends that Directive 4914, entitled "Inmate Hair and Grooming Standards," does "not have a mandated requirement anywhere mentioned that insist[s] plaintiff has to wear a religious hair covering on his dredlocks [sic] if he

want[s] to wrap his hair up as defendant[s] Savage, Coonradt, and Scroggy, Hawk, and Miller, along with [Great Meadows] grievance department[, ] demand[ed] of him and enforc[ed]."  Id. ¶ 56.  Plaintiff denounced all religious affiliations, and continued to object to the suggestion that he wear a Rastafarian or any other religious head covering.  Id. ¶ 57.  Plaintiff petitioned Ms. Bellamy and Supt. Miller to wear a non-religious covering such as a scarf or hat as an alternative to a religious head covering, but these requests were denied.  Id.  Even after "policies changed,[3] as late as April 2017," Great Meadows officials still required plaintiff to change his religion to Rastafarian to possess a crown.  Id.

## C. Conditions of Confinement Claims

Plaintiff alleges that C.O. Savage, C.O. Bogardus, and two non-party officers worked on plaintiff's housing unit.  Am. Compl. ¶ 58.  Whenever inmates were let out of their cells for meals or recreation, C.O. Savage and C.O. Bogardus, along with C.O. Kaiser, who worked at on a different housing unit, would "come to the back of the company (which [was] directly in front of plaintiff['s] cell) and wait for the inmate[s] to exit their cells which automatically open[ed] for breakfast and lunch."  Id. ¶ 59.  As inmates exited their cell, a corrections officer would note on a "go around slip" which inmates stayed in their cells and which left for either meals or recreation.  Id. ¶ 60.  The "go around slip" is then given to the "security console officer," who transcribes the

---

[3] Plaintiff does not state which policies he is referring to, nor does he elaborate as to how the policies changed.

information on a "gallery activity slip." Id. ¶ 61.  The "gallery activity slip" lets the

corrections officer know who's cell needs to be open on return from meals or recreation.

Id.

While confined in his cell, plaintiff was not provided "mess[ ]hall meals for

breakfast, lunch[,] and dinner."  Am. Compl. ¶ 62.  Plaintiff complained to a non-party

officer, who told him to "take that up with defendant Savage."  Id.  When plaintiff

attempted to complain to a non-party, unnamed officer about his deprivations, C.O.

Bogardus told that officer that "when [plaintiff's] hungry enough, he'll come out [of] his

cell the way we told him to."  Id. ¶ 63.  C.O. Savage, C.O. Bogardus, and C.O. Kaiser

knew that plaintiff was not leaving his cell for meals, programs, or recreation because

they "took the 'go around' acknowledging him not coming out of his cell."  Id. ¶ 64.

Plaintiff alleges that his cell would open when inmates returned from activities even

though it was not supposed to open.  Id. ¶ 65.  In December 2015, plaintiff filed a

complaint against C.O. Bogardus and two non-parties for "repeatedly opening up his

cell when it wasn't suppose[d] to have opened."  Id. ¶ 66.  The grievance department

did not process his complaint.  Id.  Plaintiff alleges that the fact that his cell door

opened demonstrates that C.O. Kaiser, C.O. Bogardus, and C.O. Savage had noted on

plaintiff's "go around slip" that he left his cell for meals and recreation, when he did not

leave.  Id. ¶ 67.  Plaintiff contends that these "manufactured security breaches [were]

orchestrated by named company officers and defendants Savage, Bogardus and Kaiser

. . . to shock, alarm, alert, annoy and cause him further pain."  Id. ¶ 68.

Plaintiff alleges that he was unable to sleep because, on July 11, 2016, several

inmates attacked him when his cell door was left open.  Am. Compl. ¶ 69.  Plaintiff filed

a grievance against C.O. Kaiser and C.O. Bogardus concerning the opening of his cell.

Id.  Plaintiff contends that after his grievance, defendants opened his cell "6 times as

much than before."  Id.  Plaintiff also purports that allowing plaintiff's cell door to open at

various times "misrepresent[ed] the facts about plaintiff['s] whereabouts . . . to thwart

investigations about whether or not plaintiff left his cell to go . . . eat."  Id. ¶ 70.  Plaintiff

claims that his cell door opened when it was not supposed to and/or misrepresented

when he left his cell for meals or recreation on at least fifty-five days in two different

housing units.  Id. ¶¶ 71-73.  From July 15, 2015 through April 5, 2016, plaintiff alleges

that he missed approximately 634 meals.  Id. ¶ 74.  Plaintiff only received three meals

on three consecutive days during that time period when non-party Dr. Karandy issued

him a feed in cell pass.  Id.  From April 6, 2016 through October 11, 2016, plaintiff

alleges that he missed approximately 567 meals.  Id. ¶ 75.  Plaintiff only "ate 1

complete nutritious meal" when the facility locked down on August 30, 2016.  Id.  From

October 22, 2016 through July 20, 2017, when he transferred from Great Meadows,

plaintiff alleges that he missed approximately 849 meals.  Id. ¶ 76.  Plaintiff only

received one breakfast meal during that time period.  Id.  Plaintiff developed stomach

pains and headaches, and lost energy, motivation and a "substantial amount of

[weight]" from the lack of food.  Id. ¶ 77.  Plaintiff suggests that he sold his personal

property to other inmates in order to obtain food.  Id. ¶¶ 77-78.  Plaintiff alleges that he

was "periodically" allowed to go to the commissary.  Id. ¶ 79.

### D. Deliberate Indifference to Serious Medical Needs Claims[4]

Plaintiff alleges that Mr. Jackson and Commissioner Sullivan "were made aware" of plaintiff's complaints "via [plaintiff's] numerous filed complaints."  Am. Compl. ¶ 94.  In these complaints, plaintiff "addressing specifically his unwillingness to cut his hair, change his religion, wear a religious hair covering and being [sic] confined to his cell as a result and not receiving adequate mental treatment."  Id.  Plaintiff contends that he asked Mr. Jackson and Commissioner Sullivan, either in person or by letter, that he be placed in a "Tri-Immediate Care Program" to ensure that he remained in a therapeutic environment and received his medication.  Id. ¶ 95.  Mr. Jackson and Commissioner Sullivan failed to place plaintiff in the medical department, and did not refer him to MHU nurses.  Id. ¶ 96.

### II. Discussion[5]

### A. Legal Standard

Under Rule 12 (b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all

---

[4] Defendants do not move to dismiss plaintiff's Eighth Amendment deliberate indifference claims.  Dkt. No. 33-1 ("Def. Mem. of Law") at 5.  However, defendants do argue that plaintiff's Eighth Amendment deliberate indifference claim should be dismissed against OMH Commissioner Sullivan and MHU Chief Jackson due to a lack of personal involvement.  See id. at 4.  As such, the undersigned sets forth the facts as they relate to plaintiff's allegations against Commissioner Sullivan and Mr. Jackson.

[5] All unpublished opinions cited to by the Court in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 326, 335 (2d Cir. 2009)) (internal quotation marks omitted).  However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "'plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible . . . .") (internal citations omitted).  Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such

10

> submissions must be read to raise the strongest arguments that they suggest.  At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff, 537 F.3d at 191-92 ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, . . . a court is obliged to construe his pleadings liberally.") (internal citations omitted).

### B. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (additional citations omitted)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  See id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (additional citation omitted)).[6]  Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact.  See, e.g., Brown v. Artus, 647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009).

**1. Commissioner Sullivan and Mr. Jackson**

Plaintiff proffers two letters addressed to Commissioner Sullivan, dated October 10, 2016 and February 16, 2017, concerning his alleged inadequate treatment.  See Dkt. No. 12-1 at 49, 60.  In both letters, plaintiff states that he "wrote to the Unit Chief" numerous times, and in his complaint he suggests that he, "at one time or another, either in person or by way of letter[,]" contacted Mr. Jackson and requested placement in a therapeutic program.  See id.; Am. Compl. ¶ 95.

Construing plaintiff's allegations liberally, he is contending that Commissioner Sullivan and Mr. Jackson, after being informed of alleged constitutional violations, failed

---

[6] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision has affected the five Colon factors which were traditionally used to determine personal involvement.  See Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 185 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster...."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

to remedy the wrong, which falls under the second Colon factor.  See Am. Compl. ¶¶ 94-95; Colon, 58 F.3d at 873.   The Second Circuit has held that, at the initial pleading stage, an inmate's complaint may survive a motion to dismiss based on a defendant's lack of personal involvement if the inmate's complaint "contain[s] factual allegations indicating that the [l]etter was sent to the [official] at an appropriate address and by appropriate means — that the [official] in fact received the [l]etter, read it, and thereby became aware of the alleged conditions by which [the inmate] complained." Grullon v. City of New Haven, 720 F.3d 133, 140 (2d Cir. 2013).  Although plaintiff proffers copies of letters that he alleges he sent to Commissioner Sullivan at her work address, there is no indiction that she received or read the letters, or otherwise became aware of plaintiff's allegations.  See Dkt. No. 12-1 at 49, 60.  Nor does plaintiff provide Commissioner Sullivan's response to his letters.

As defendants note, there is some indication that at least one of plaintiff's letters to Commissioner Sullivan was forwarded to the Risk Management Department at the Central New York Psychiatric Center.  Id. at 52 (indicating in a letter, dated January 9, 2017, that plaintiff's "numerous letters composed over the past few months, which were addressed to various parties, have been forwarded to this department . . . for review and response.").  Courts have generally held that a supervisory official's action of referring a complaint to a subordinate official does not constitute personal involvement. See Rucano v. Koenigsmann, No. 9:12-CV-00035 MAD, 2014 WL 1292281, at *11 (N.D.N.Y. Mar. 31, 2014) (citing cases).   However, the Second Circuit's decision in Grullon called that theory into question, and "it would appear that plaintiffs within the

13

Second Circuit are 'entitled to have the court draw the reasonable inference . . . that[, in a situation where a supervisory official referred a letter to a subordinate,] the [official] in fact received the Letter, read it, and became aware of the alleged conditions of which [the inmate] complained." Id. (citation omitted).  Because there is some suggestion that Commissioner Sullivan may have referred plaintiff's letters to her subordinates in the Risk Management Department, at this stage in the litigation, the undersigned affords plaintiff the benefit of this inference.  "[I]t is possible that [at least one of] [p]laintiff's letter[s] to [Commissioner Sullivan] put [her] on notice of a continuing violation of [p]laintiff's [constitutional] rights, and [s]he failed to take any action to remedy the wrong."  Id.  Thus, it is recommended that defendants' motion as to Commissioner Sullivan be denied.

As to Mr. Jackson, plaintiff does not proffer copies of letters sent to Mr. Jackson or reference any specific correspondence.  In opposition, plaintiff suggests for the first time that plaintiff "wrote numerous letters and submitted several complaints" to Mr. Jackson. Pl. Opp. at 11.  Plaintiff also states that Mr. Jackson "was confronted with copies of his complaints," "was questioned about the inadequate treatment plaintiff was alleging," and that other mental health unit clinicians went to Mr. Jackson "for advice on how to best treat him."  Id.  "The conclusory nature of this argument, without any supporting facts, is insufficient" to establish Mr. Jackson's personal involvement on a motion to dismiss.  Burkes v. New York State Dental Ass'n, No. 12 CIV. 2593 GBD, 2013 WL 3784143, at *4 (S.D.N.Y. July 18, 2013).  As such, it is recommended that defendants' motion as to Mr. Jackson be granted.

**2. Ms. Bellamy**

As to Ms. Bellamy, plaintiff alleges that she violated his constitutional rights by "rul[ing] on his grievances in a way that [1] prohibited him from wearing his dredlocks [sic] on the top of his head without a Rastafarian crown, when he's not Rastafarian"; (2) "would force and/or encourage him to be a member of the Rastafarian religion so he could wear their religious hair covering . . . even [though] . . . plaintiff is non-religious . . . ;" and (3) discriminated against him by affording similarly situated Rastafarian inmates with dredlocks [sic] an opportunity to secure their hair up with a religious hair covering, but not letting plaintiff a non-Rastafarian/religious inmate . . . the same opportunity to secure his hair[.]"  Am. Compl. ¶¶ 113-15.  Plaintiff's allegations do not demonstrate that Ms. Bellamy was personally involved in any violation of his constitutional rights.  Merely alleging that Ms. Bellamy executed the CORC determinations which affirmed the decisions of other defendants is insufficient to allege her personal involvement. See Persad v. Savage, No. 02-CV-336S, 2004 WL 1570286, at *7 (W.D.N.Y. May 25, 2004) (finding that the plaintiff's allegations insufficient where the plaintiff alleged, without more, that Bellamy was personally involved because her signature was on the official record of the CORC decision).

Similar to Mr. Jackson, plaintiff's allegations in opposition that as the DOCCS grievance director, Ms. Bellamy "was familiar with plaintiff's grievance before she rendered a CORC decision" are conclusory in nature and lack sufficient factual evidence to establish her personal involvement.  See supra, at 14; Burkes, 2013 WL 3784143, at *4; Pl. Opp. at 11.  Moreover, plaintiff provides no support for his

accusation that, as Director of the DOCCS Inmate Grievance Program, Ms. Bellamy had the authority to "alter the requirements that defendants on a facility level demanded of plaintiff."  Pl. Opp. at 11.  Accordingly, it is recommended that defendants' motion as to Ms. Bellamy be granted.

### C. Free Exercise Claim

Plaintiff alleges that Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Mr. Scroggy "issued orders [or] enforced [those orders] in a way that prohibited [plaintiff] from wearing his dredlocks [sic] on the top of his head without a Rastafarian crown, when he's not Rastafarian, thus imposing a substantial burden on his right to practice his non-religious beliefs[.]" Am. Compl. ¶ 113.  Defendants argue that plaintiff "does not claim that any of the Moving Defendants took any action that substantially burdened his sincerely held religious beliefs."  Def. Mem. of Law at 7.

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).  "However, due to the unique concerns of the prison setting, prisoners' free exercise rights must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system."  Thomas v. Waugh, No. 9:13-CV-0321 MAD/TWD, 2015 WL 5750945, at *9 (N.D.N.Y. Sept. 30, 2015) (citing Ford, 352 F.3d at 588).  As such, "a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise 'is judged under a

16

reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests.'" Id. (quoting Salahuddin v. Goord, 467 F.3d 263, 274 (2d Cir. 2006)).

In order to establish a free exercise claim, a plaintiff must demonstrate "at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." Salahuddin, 467 F.3d at 274-75 (citing Ford, 352 F.3d at 591). A belief is sincerely held where the plaintiff "sincerely holds a particular belief and whether the belief is religious in nature." Ford, 352 F.3d at 590 (citation and quotation marks omitted). Moreover, it is well-established that an inmate's "sincerely held belief is substantially burdened where 'the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" Thomas, 2015 WL 5750945, at *10 (quoting Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir.1996) (punctuation omitted) (holding that Rastafarian prisoner's sincerely held religious belief that he was prohibited from submitting to a test for latent tuberculosis was "substantially burdened" where he was forced to choose between "submitting to the test or adhering to [his] beliefs and enduring medical keeplock.")).

In opposition, plaintiff argues that he is an atheist and "in accordance to such beliefs, he refutes religious dogma that mandate a belief in the existence of a God he cannot see." Dkt. No. 44 ("Pl. Opp.") at 5.[7] Plaintiff further contends that "there is a

---

[7] It is well-settled that atheism is protected under the First Amendment. See Hatzfeld v. Eagen, No. 9:08-CV-283 (LES/DRH), 2010 WL 5579883, at *6 (N.D.N.Y. Dec. 10, 2010), report and recommendation adopted 2011 WL 124535 (N.D.N.Y. Jan. 14, 2011) ("Atheists are protected by the First Amendment.") (citing cases); see also Wallace v. Jaffree, 472 U.S. 38, (1985) ("[T]he Court has

spiritual connection that plaintiff align himself with, hair included, that is in harmony with nature that's visible to all." Id.  Plaintiff alleges that he "believes in beauty untamed, left to grow wild and free." Id.  The undersigned does not question plaintiff's adherence to his atheist beliefs.  However, plaintiff fails to allege in non-conclusory terms how wrapping his dreadlocks atop his head and/or covering the wrapped hair with a crown or head covering is otherwise related to a sincerely-held belief.  Although plaintiff does mention his belief of "harmony with nature that's visible to all" and "beauty untamed," id. at 5, plaintiff does not demonstrate how this belief translates to his desire to wrap his hair atop his head.  Moreover, plaintiff does not allege, and there is no indication in the pleadings, that defendants infringed on plaintiff's ability to wear his hair in the dreadlock hairstyle.  Plaintiff also suggests that he desired to "maintain clean hair," but fails to allege how that desire relates to his atheistic beliefs.  See id. at 7.  Thus, the undersigned concludes that plaintiff has failed to demonstrate that his desire to wrap his dreadlocks atop his head and/or cover the wrapped hair with a crown or head covering is connected to his religious beliefs as an atheist.  "Plaintiff has no freestanding right to wear a crown, separate from any First Amendment right that he may have in that regard.  If plaintiff has a right to wear his crown, then that right exists by virtue of his right to practice his religion." Barnes v. Fedele, 760 F. Supp. 2d 296, 302 (W.D.N.Y. 2011).  As the undersigned has concluded that plaintiff has not demonstrated that his

---

unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all.").

18

desire to wrap his hair atop his head with a head covering is connected to his atheistic beliefs, it is recommended that defendants' motion to dismiss on this ground be granted.

### D. Establishment Clause Claim

Plaintiff contends that Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Mr. Scroggy "issued orders . . . in a way that would force and/or encourage [plaintiff] to be a member of the Rastafarian religion so he could wear their religious hair covering in order to wrap his dreadlocks up even after becoming aware that plaintiff is non-religious and didn't want to practice the tenets of any religion."  Am. Compl. ¶ 114.  Defendants argue that (1) the religious exemption in Directive 4914 for Rastafarian inmates is constitutional; and (2) plaintiff's First Amendment rights were not violated when they advised plaintiff to register as a Rastafarian in order to wrap his hair atop his head.  See Def. Mem. of Law at 8-12.

The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion."  U.S. CONST. amend. I.  It ensures that the government does not "coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a [state] religion." Muhammad v. City of New York Dep't of Corrs., 904 F. Supp. 161, 197 (S.D.N.Y. 1995) (citation omitted).   "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."  Skoros v. City of New York, 437 F.3d at 1, 39 (2d Cir. 2006) (citation omitted).  In Lemon v. Kurtzman,

the United States Supreme Court set forth a test to assess whether a government practice satisfies the Establishment Clause.  See Lemon v. Kurtzman, 403 U.S. 602, 612-13, reh'g denied 404 U.S. 876 (1971).  "The Lemon test requires the Court to consider: (1) whether the government action in question has a secular purpose; (2) whether the primary effect of the action, as seen by a reasonable observer, 'neither advances nor inhibits religion,' and (3) whether the action fosters 'excessive government entanglement with religion.'"  Lewis v. Zon, 920 F. Supp. 2d 379, 386 (W.D.N.Y. 2013) (citing Lemon, 403 U.S. at 612-13).  However, "as with the Free Exercise Clause, prison officials are permitted to 'make [ ] difficult judgments concerning institutional operations,' as stricter scrutiny would 'seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.'"  Powlette v. Morris, No. 13 CIV. 7378 (KPF), 2016 WL 3017396, at *8 (S.D.N.Y. May 23, 2016) (quoting Turner v. Safley, 482 U.S. 78 (1987)).

### 1. Religious Exemption

In Cardew v. Bellnier, this Court assessed the plaintiff's allegations that the prison violated the Establishment Clause by failing to provide red meat on the menu in the mess hall on Ash Wednesday and every Friday during the Lenten Season in observance of the Catholic religion.  See Cardew v. Bellnier, No. 9:09-CV-775 (GLS/ATB), 2010 WL 7139218, at *4 (N.D.N.Y. Dec. 9, 2010), report and recommendation adopted 2011 WL 3328632 (N.D.N.Y. Aug. 2, 2011).  This Court

applied the reasoning of a Third Circuit Court of Appeals case in rejecting the

Establishment Clause challenging, finding that

> . . . [The jail's] actions had the secular purpose of feeding the inmates. The service of these meals did not have the primary effect of advancing Catholicism or inhibiting other religions, nor did it foster the excessive entanglement of government with religion. The eating of a vegetarian repast is not inherently linked to a religious practice. Vegetarian meals are regularly eaten by many different people on an everyday basis, regardless of their religion.

Id. at 14 (quoting Travillion v. Leon, 248 F. App'x 353, 355-56 (3d Cir. 2007) (summary

order).

Moreover, this Court found that "the DOCS menu policies would also pass

muster under the Establishment Clause even if, as plaintiffs argue, the policy was

intended to accommodate the dietary needs or preferences of Catholic inmates."

Cardew, 2010 WL 7139218, at *15. The Court found that the plaintiff's allegations fell

within the "niche" that has "been carved into the establishment clause to require the

government to afford opportunities for worship." Id. at *14-15 (citation and internal

quotation marks omitted). This Court reasoned that

> [i]f DOCS is accommodating other inmates' religious dietary practices, plaintiffs argue that defendants are violating the Establishment Clause. However, because of the nature of a penal institution, which controls practically every aspect of inmates' lives, accommodating the free exercise of the religion of choice by inmates necessarily involves some involvement by the government with religion.

Id. at *15.

The undersigned finds this Court's reasoning in Cardew instructive. As

defendants set forth, the religious exemption to Directive 4914 that allows for

Rastafarian inmates to "wear their dreadlocks in an approved religious head covering,"

Dkt. No. 12-1 at 33, "was apparently intended to accommodate inmates' religious rights,

while still taking account of genuine and serious security needs." Barnes, 337 F. Supp.

3d at 234; Def. Mem. of Law at 10.  It is well-settled in this Circuit that "[t]he crown is

worn as a Rastafarian tradition, to keep impurities from the dreadlocks, to shield them

from the eyes of non-Rastafarians, and to keep the curious from touching them."

Benjamin v. Coughlin, 708 F. Supp. 570, 574 (S.D.N.Y. 1989), aff'd 905 F.2d 571 (2d

Cir. 1990).  Similar to the dietary practice in Cardew, even if DOCCS' intention was to

accommodate the religious practices of Rastafarian inmates, such accommodation

would fall into the "niche" that has "been carved into the establishment clause to require

the government to afford opportunities for worship."   Cardew, 2010 WL 7139218, at

*14-15.  There is no indication that the religious exemption advances one religion over

another; as defendants note, "it merely allows those with 'genuine' and 'sincere'

religious beliefs to live in conforming with those beliefs as a part of the prison

population."  Def. Mem. of Law at 10 (citing Turner v. Liverpool Cent. Sch., 186 F. Supp.

2d 187, 192 (N.D.N.Y. 2002)).  Further, "the exemption does not have the 'effect' of

advancing or inhibiting religion because it does not promote religious beliefs, nor does

the law promote one religious group over any other"; in fact, the undersigned notes that,

although prison officials are not "obligated to provide an inmate with 'head coverings of

their choice,'" Barnes v. Furman, 629 F. App'x 52, 56 (2d Cir. 2015) (summary order),

"inmates retain their right to possess and wear religious head coverings subject to

legitimate penological interests." Barnes v. Annucci, No. 9:15-CV-0777 (GLS/DEP),

2017 WL 9511184, at *8 (N.D.N.Y. July 14, 2017), report and recommendation adopted 2017 WL 3834751 (N.D.N.Y. Sept. 1, 2017); see Barnes, 760 F. Supp. 2d at 302 ("It does appear . . . that Rastafarian inmates are permitted to wear crowns, while Jewish prisoners are permitted to wear yarmulkes[.]").

As such, the undersigned finds the religious exemption does not fall victim to the Establishment clause, and it is recommended that defendants' motion on this ground be granted.

### 2. Rastafarian Registration

Plaintiff suggests that defendants attempted to force him to register as a Rastafarian in order to be able to wear a covering over his dreadlocks. See Am. Compl. ¶¶ 35, 47; Pl. Opp. at 6. The Second Circuit has held that "[r]egistration of religious affiliation . . . entails only a modest act of commitment by the inmate." Jackson-Bey v. Hanslmaier, 115 F.3d 1091, 1096 (2d Cir. 1997). In Rose v. Annucci, the plaintiff refused to sign a "Religious Meal Form" that he contended was "incompatible with his Muslim faith," despite the defendants' warnings that he would not be able to participate in the Muslim festival of Eid-Ul-Adha if he did not sign the form. Rose v. Annucci, No. 9:16-CV-787 (BKS.ATB), 2018 WL 2729259, at *2 (N.D.N.Y. Apr. 19, 2018), report and recommendation adopted 2018 WL 2727874 (N.D.N.Y. June 6, 2018). This Court held that the defendants' insistence that the plaintiff sign the Religious Meal Form did not violate his First Amendment rights as the Form "only require[d] an inmate to register 'to participate in a religious meal for your registered religion of record.'" Id. at *10. The

Court found that the plaintiff had not alleged any facts that would suggest that he was forced to alter or abandon his religious affiliation or practices as a result of the form." Id.  Similarly, in Jones v. Annucci, the Southern District of New York found, even at an early stage in the litigation, that "filling out and signing a form to register under a religious affiliation to receive accommodations is an inconvenience, not a substantial burden."  Jones v. Annucci, No. 16-CV-3516 (KMK), 2018 WL 910594, at *16 (S.D.N.Y. Feb. 14, 2018) (concluding that the plaintiff signing a form changing his religious designation from "Islam" to "Shia" did not violate his First Amendment rights).

The undersigned acknowledges that defendants argue that plaintiff "would [not] have been required to participate in any religious services or otherwise practice any particulate tenets of Rastafarian faith."  Def. Mem. of Law at 12.  However, in contrast to Rose and Jones, plaintiff contends that the presence of the hair covering in and of itself is a practicing tenet of the Rastafarian faith.  Pl. Opp. at 6.  Thus, plaintiff suggests that by wearing the hair covering, he is practicing and/or subscribing to the Rastafarian religion.  See id.  Moreover, plaintiff alleges that Mr. Scroggy informed him that he needed to cut his hair or change his religion to Rastafarian and wear a crown "and this [issue] will go away," Am. Compl. ¶ 47.  The undersigned is mindful that the purpose of the Establishment Clause is to ensure that the government does not "coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a [state] religion." Muhammad, 904 F. Supp. at 197.   Based on the facts provided, and in absence of any affidavits or other evidence from defendants supporting otherwise, the undersigned concludes plaintiff has adequately pleaded that the

24

defendants' attempts to have plaintiff change his religious affiliation to Rastafarian violated the Establishment Clause.  Accordingly, it is recommended that defendants' motion on this ground be denied.

### i. Qualified Immunity

Defendants argue that even if plaintiff properly alleged a claim under the Establishment Clause, they are entitled to qualified immunity.  See Def. Mem. of Law at 14-18.  Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988).  "The Second Circuit has recognized that the availability of qualified immunity may turn 'on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings.'"  Allah v. Kemp, No. 9:08-CV-1008 (NAM/GHL), 2010 WL 1036802, at *7 (N.D.N.Y. Feb. 25, 2010), report and recommendation adopted 2010 WL 1035657 (N.D.N.Y. Mar. 18, 2010) (quoting Taylor v. Vermont Dept. of Educ., 313 F.3d 768, 793 (2d Cir. 2002)).  As such, "where the 'objective reasonableness' of [d]efendants' actions depends at least in part on what information they had regarding the substance of [p]laintiff's complaints, an adjudication as to the applicability of the qualified immunity affirmative defense on the basis of the pleadings alone would be premature."  Id.

Accepting all of the allegations set forth in the amended complaint as true, and

construing them in plaintiff's favor, the undersigned finds that defendants are not entitled to qualified immunity at this stage in the litigation.  Plaintiff alleges that defendants continued to "force and/or encourage him to be a member of the Rastafarian religion so he could wear their religious hair covering in order to wrap his dredlocks [sic] up even after becoming aware that plaintiff [was] non-religious and didn't want to practice the tenets of any religion."  Am. Compl. ¶ 114.  Because the undersigned has recommended that plaintiff's Establishment Clause claim proceed as it pertains to plaintiff's allegations concerning registration under the Rastafarian religion, "[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation."  Denton v. McKee, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004).  Accordingly, it is recommended that defendants' motion on this ground be denied.

### E. Equal Protection Claim

Plaintiff contends that defendants issued and/or enforced orders in a way that "discriminated against him by affording similarly situated Rastafarian inmates with dredlocks [sic] an opportunity to secure their hair up with a religious hair covering, but not letting plaintiff a non-Rastafarian/religious inmate with floor length dredlocks [sic] the same opportunity to secure his hair[.]"  Am. Compl. ¶ 115.  "To establish an equal protection cause of action, a plaintiff must prove that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class."  Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir.

26

1995).  If a court finds such discrimination, "the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests."  Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990).

To the extent that plaintiff appears to suggest that Directive 4914 was disproportionately applied to him, the undersigned agrees with defendants that this is not the case.  See Am. Compl. ¶ 56; Def. Mem. of Law at 13.  Directive 4914 provides, in part, that "[t]he dreadlock hairstyle is allowed . . . .  Inmates wearing below shoulder length dreadlocks must tie them back in a ponytail with a barrette, rubber band, or other fastening device approved by the Superintendent.  Note: Inmates of the Rastafarian religious faith may wear their dreadlocks in an approved religious head covering."  Dkt. No. 12-1 at 33 (emphasis in original).  As defendants note, the Directive states that an inmate's only alternative to tying his hair back in a ponytail is to wear his or her dreadlocks under an approved religious hair covering, and such alternative was reserved for Rastafarian inmates.  See id.; Def. Mem. of Law at 33.  As such, C.O. Savage's instruction that plaintiff could not leave his cell with his hair wrapped atop his head without an approved religious head covering was consistent with the application of Directive 4914.  Insofar as plaintiff argues that he was in compliance with the Directive because his dreadlocks were not below shoulder length because he had them secured atop his head, the undersigned declines to adopt plaintiff's constructive interpretation. See Pl. Opp. at 7.  Plaintiff clearly states that his dreadlocks "reach[ ] the floor either standing up or sitting down, and the amended complaint makes clear that plaintiff did

not wear his hair in a ponytail but instead attempted to secure it atop his head.  Am. Compl. ¶ 29; see Pl. Opp. at 7.  Therefore, the undersigned finds that defendants did not discriminate against plaintiff in their application of Directive 4914.

As to plaintiff's allegations that defendants "discriminated against him by affording similarly situated Rastafarian inmates with dredlocks [sic] an opportunity to secure their hair up with a religious covering, but [did not let] plaintiff a non-Rastafarian/religious inmate with floor length dredlocks [sic] the same opportunity to secure his hair up minus the religious hair covering," the undersigned finds that this argument similarly fails.  In Barnes v. Fedele, the Western District of New York assessed whether the defendants' application of a DOCCS directive allowing for certain religious head coverings violated the plaintiff's Fourteenth Amendment rights.  See Barnes, 760 F. Supp. 2d at 302.  Plaintiff alleged that a defendant corrections officer confiscated his "religious crown for [his] dreadlocks," which the plaintiff described as "'religion head wear' that [he] wears in accordance with his faith."  Id. at 299.  The Court noted that the DOCCS Directive in question permitted Rastafarian inmates to wear crowns, while Jewish inmates wore yamulkes, which the plaintiff claimed was impractical for him because of his dreadlocks.  See id. at 302.  In interpreting the plaintiff's allegations as an equal protection claim based "on the fact that Rastafarian, but not Jewish, inmates are permitted to wear crowns," the Court found that the claim was subject to dismissal.  Id.  The Court noted that the plaintiff's equal protection claim was "both derivative and duplicative of [his] claim that defendants violated his First Amendment right to freely exercise his religion.  Id.  The Court determined that the

28

> [p]laintiff ha[d] no freestanding right to wear a crown, separate from any First Amendment right that he may have in that regard. If plaintiff ha[d] a right to wear his crown, then that right exists by virtue of his right to practice his religion. If he does not have such a right (because, for example, his religious beliefs do not in fact require plaintiff to wear a crown, or because his purported religious beliefs are not sincerely held), then the fact that other inmates (such as Rastafarians) have been allowed to wear crowns for religious reasons does not give rise to an equal protection claim, since plaintiff and those other inmates would not be similarly situated. This claim is therefore subject to dismissal as duplicative of plaintiff's free-exercise claim.

Id.

Similarly, here, the undersigned concluded that plaintiff's allegations did not give rise to a First Amendment free exercise claim as he failed to adequately plead that his desire to wear his hair wrapped atop his head with a hair covering was related to his atheistic beliefs. See supra, at 16-19. Thus, as the plaintiff in Barnes, because plaintiff's desire to wrap his hair atop his head is not related to his atheistic beliefs, it cannot be said that he and Rastafarian inmates are not similarly situated because, as currently pleaded, his religious beliefs do not require him to wear a crown atop his head covering his hair. See Barnes, 760 F. Supp. 2d at 302. As such, the undersigned finds plaintiff's equal protection claim duplicative of his free exercise claim. Accordingly, it is recommended that defendants' motion on this ground be granted.

## F. Conditions of Confinement

Plaintiff contends that C.O. Savage, C.O. Bogardus, and C.O. Kaiser "deprived [him] of recreation, programs, and approximately 2,059 nutritiously prepared mess[ ]hall

29

meals over a time span of 22 months, causing [plaintiff] to lose a substantial amount of [weight], (suffering) stomach pains, headaches, dizzy spells, lack of energy and motivation, breaking out with rashes and depression."  Am. Compl. ¶ 118.  Plaintiff also suggests that defendants "manufactur[ed] security breaches" and allowed inmates to attack and throw fecal matter and urine on him.  Id.

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Objectively, the deprivation must be "sufficiently serious [such] that [the inmate] was denied the minimal civilized measure of life's necessities[.]"  Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and citation omitted).  To satisfy the subjective test, the inmate must show that "the defendant official acted with a sufficiently culpable state of mind . . . such as deliberate indifference to inmate health or safety."  Id. (internal quotation marks and citation omitted); see also Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002).

The objective prong can be satisfied where the plaintiff pleads "conditions [that] either alone or in combination, pose an unreasonable risk of serious damage to [the plaintiff's] health[.]"  Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125).  There is no "static test" to determine whether or not an alleged

deprivation is sufficiently serious to satisfy the objective prong.  Id.  Rather, courts must determine whether the conditions violate "contemporary standards of decency."  Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)) (additional citation omitted).

### 1. Confinement

As an initial matter, defendants argue that C.O. Savage did not confine plaintiff to his cell.  See Def. Mem. of Law at 19.  Plaintiff contends that C.O. Savage gave him a direct order that "prohibited him from exiting his cell with his hair up . . . without a religious hair covering on it," which otherwise prevented him from leaving his cell for twenty-two months.  Pl. Opp. at 8; Am. Compl. ¶¶ 34, 35, 118.  Although defendants argue that "[a]t most, . . . [C.O.] Savage ordered [p]laintiff not to leave his cell *in a non-compliant manner* — in other words, what any reasonable and responsible Correction Officer would do," Def. Mem. of Law at 19, it is arguable under these facts that plaintiff interpreted C.O. Savage's instruction as a direct order not to leave his cell without a religious head covering, and, because plaintiff was unwilling to change his religion to Rastafarian in order to wear the religious crown, he remained in his cell as ordered by C.O. Savage.  See Am. Compl. ¶¶ 33, 34.  Based on the facts provided, and in absence of any affidavits or other evidence from defendants supporting otherwise, it cannot be said that no reasonable fact-finder could conclude that C.O. Savage confined plaintiff to his cell.  Accordingly, defendants' motion on this ground is denied.

31

## 2. Nutritionally Adequate Meals

To the extent that plaintiff contends that C.O. Savage, C.O. Kaiser, and C.O. Bogardus denied him meals, the undersigned reaches a similar conclusion.  "The Eighth Amendment requires that prisoners be provided with 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'"  Banks v. Annucci, 48 F. Supp. 3d 394, 406-07 (N.D.N.Y. 2014) (quoting Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983)).  Courts have found "such a deprivation to be actionable[ where] [a] plaintiff[ ] [has] asserted a complete denial of food or [was] provided food that was inedible."  Corley v. City of New York, No. 1:14-CV-3202-GHW, 2017 WL 4357662, at *14 (S.D.N.Y. Sept. 28, 2017) (citations omitted).

Plaintiff alleges that he was denied approximately 2,059 "nutritiously prepared mess[ ]hall meals" over the course of twenty-two months.  Am. Compl. ¶ 118. Moreover, plaintiff contends that he suffered from stomach pains, headaches, dizzy spells, hives, depression, and lack of energy and motivation due to his inability to receive his meals.  See id.  Although plaintiff suggests had access to some food through bartering with other inmates and "periodic[ ]" trips to the commissary, id. ¶¶ 77-79, at this early juncture, and drawing all inferences in plaintiff's favor as the nonmoving party, the undersigned finds that plaintiff adequately asserted that C.O. Savage's direct order not to leave his cell with his hair wrapped atop his head without a religious head covering, C.O. Kaiser and C.O. Bogardus' adherence to that direct order, and plaintiff's unwillingness to change his religion to Rastafarian constitutes a denial of

"nutritionally adequate food."  Banks, 48 F. Supp. 3d at 406-07; see Barnes v. Ross, 926 F. Supp. 2d 499, 507 (S.D.N.Y. 2013) ("It may be that the facts are not as [the plaintiff] has pleaded — [. . .] — but that is not the question currently before the Court on defendants' motion to dismiss.").

Accordingly, construing the amended complaint liberally under the special solicitude due to the pro se plaintiff, the undersigned recommends that defendants' motion on this ground be denied.

### 3. Recreation and Programs

Insofar as plaintiff suggests that he was denied access to recreation and/or programs, such argument must fail.  See Am. Compl. ¶ 118.  Plaintiff alleges that he was deprived of opportunities to exercise in the yard for twenty-two months.  Pl. Opp. at 8.  However, there is no constitutional right to outdoor recreation, and "[c]ourts have 'found no violation where the inmate has an opportunity for exercise, either in or outside of his cell[.]'"  Brogdon v. City of New York, No. 16-CV-8076 (LAK)(RWL), 2018 WL 4762981, at *11 (S.D.N.Y. Aug. 8, 2018), objections overruled 2018 WL 4757947 (S.D.N.Y. Oct. 1, 2018) (quoting Little v. Mun. Corp., 51 F. Supp. 3d 473, 489 (S.D.N.Y. 2014); see also Huggins v. Schriro, No. 14 Civ. 6468, 2015 WL 7345750, at *6 (S.D.N.Y. Nov. 19, 2015), report and recommendation adopted 2016 WL 680822 (S.D.N.Y. Feb. 18, 2016) (dismissing claim where plaintiff had not alleged that he could not exercise in his cell)).  Thus, plaintiff's claims that defendants denied him access to recreation must fail.

Plaintiff's claims regarding defendants' denial of his access to programs must also fail. See Am. Compl. ¶ 118. It is well-settled that inmates do not have a constitutional right to participation in prison programs. See Barnes v. Abdullah, No. 11 CIV. 8168 RA, 2013 WL 3816586, at *3 (S.D.N.Y. July 22, 2013) ("As several courts have held, inmates do not have a constitutional right to participate in prison programs.") (citing cases); Self v. LaValley, No. 9:10-CV-1463 (GTS/TWD), 2012 WL 7810950, at *5 (N.D.N.Y. Dec. 27, 2012), report and recommendation adopted 2013 WL 1294448 (N.D.N.Y. Mar. 27, 2013) (same). As such, plaintiff's claims concerning lack of access to programs must fail.

Accordingly, to the extent that plaintiff suggests that his confinement deprived him of access to programs and recreation, it is recommended that defendants' motion on this ground is granted.

### 4. Locked Cell Door

Plaintiff asserts that C.O. Savage, C.O. Kaiser, and C.O. Bogardus kept his cell door open on approximately fifty-four occasions, wherein inmates were able to attack plaintiff and throw fecal matter and urine on him. See Am. Compl. ¶¶ 117, 118. Plaintiff contends that he suffered from sleep deprivation as a result of defendants' alleged conduct. Id. ¶ 118. The undersigned finds that plaintiff fails to allege an Eighth Amendment violation for the reasons set forth in defendants' memorandum of law. See Def. Mem. of Law at 20-21.

A prison official is not liable, and an inmate fails to establish the subjective

34

element of an Eighth Amendment conditions of confinement claim, "unless the official knows of and disregards an excessive risk to inmate health or safety[.] . . . [T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.  To satisfy the subjective element of a conditions of confinement claim, an inmate must show that the "defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed." Darnell, 849 F.3d at 35.  Actions that are merely negligent fail to satisfy the subjective element. Id. at 36.

Here, although plaintiff alleges that several inmates assaulted him on July 11, 2016 because his door was left open, see Am. Compl. ¶ 69, plaintiff fails to allege that defendants intentionally left the door open to allow inmates to assault plaintiff or recklessly failed to act to mitigate such risk.  See Darnell, 849 F.3d at 35.  Further, as defendants point out, plaintiff does not claim that inmates continued to assault him after he filed a grievance about the alleged incident.  See Def. Mem. of Law at 20.  Thus, as to the alleged inmate-on-inmate assault, plaintiff has failed to adequately allege that defendants acted with a sufficiently culpable state of mind under the subjective prong of the test.

As to plaintiff's allegations concerning inmates throwing fecal matter and urine on him due to his opened cell door, see Am. Compl. ¶ 118, plaintiff similarly does not allege that defendants intentionally allowed for such incident to occur, or that they even knew the incident took place.  Although plaintiff states that he filed a grievance "[a]s

early as Dec. 2015" against C.O. Bogardus concerning the opening of his cell door, plaintiff also alleges that this grievance was not processed.  Id. ¶ 66.  Plaintiff further seems to suggest that he filed a second grievance against C.O. Kaiser and C.O. Bogardus entitled "C.O.'s be more careful," which he claims was fully exhausted.  Id. ¶ 69.  However, it is unclear when plaintiff filed such grievance, and if that grievance contained allegations concerning other inmates' throwing of fecal matter and urine.  See id.  As such, it cannot be said that defendants acted intentionally or recklessly failed to act with regard to opening the door.

As to plaintiff's assertion that C.O. Savage, C.O. Kaiser, and C.O. Bogardus had his cell door open to "thwart investigations about whether or not plaintiff left his cell to go to chow and eat," the undersigned reaches a similar result.  Plaintiff contends that on January 28, 2017, an unnamed lieutenant came to his cell to investigate his grievance against Kaiser, Bogardus, and others "about opening up my cell and the harm it caused me."  Am. Compl. ¶ 73.  Plaintiff indicates that he informed the unnamed lieutenant that he was not eating, and that the lieutenant told him that the log indicated that he had been to the mess hall.  Id.  Plaintiff sets forth a series of occasions wherein his cell door opened during meal times "when it wasn't supposed to."  Id.  Plaintiff further contends that C.O. Savage, C.O. Bogardus, and C.O. Kaiser knew that he was not leaving his cell for meals because they "took the 'go around [slip]'" that indicated that he was not leaving his cell.  Id. ¶ 64.  Plaintiff alleges that the fact that his cell door opened demonstrates that C.O. Kaiser, C.O. Bogardus, and C.O. Savage had noted on plaintiff's "go around slip" that he left his cell for meals, when he did not leave.  Id. ¶ 67.

Even if defendants knew that plaintiff had not left his cell, but opened his cell door in an attempt to establish that he was leaving, plaintiff has failed to demonstrate that such conduct amounted to a sufficiently serious injury to satisfy the objective prong of the Eighth Amendment analysis.  See Darnell, 849 F.3d at  30 (quoting Walker, 717 F.3d at 125).  Therefore, plaintiff has failed to adequately plead that defendants attempted to "thwart investigations" concerning the opening of his cell door.

Similarly, insofar as plaintiff suggests that C.O. Savage, C.O. Kaiser, and C.O. Bogardus failed to protect him from the abovementioned actions by other inmates, such allegations cannot stand.  In order to state an Eighth Amendment claim for failure to protect, the plaintiff must show, objectively, that he was incarcerated under conditions posing a substantial risk of serious harm, and, subjectively, that prison officials acted with deliberate indifference to that risk and the inmate's safety.  See Farmer, 511 U.S. at 836.  The plaintiff must show that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety.  See id. at 837. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference.  See id.

Plaintiff fails to contend that defendants knew of and disregarded an excessive risk to his safety.  Eighth Amendment failure to protect claims are not to be based on a defendant's knowledge of a "general risk" of harm to an inmate. See, e.g., Hogan v. Fischer, No. 09-CV-6225, 2012 WL 4845609, at *6 (W.D.N.Y. Oct. 10, 2012) (internal citation omitted) (holding the failure to protect the plaintiff against a general threat of harm is insufficient to raise a failure to protect claim under the Eighth Amendment)

37

<u>vacated in part on other grounds</u> 738 F.3d 509 (2d. Cir. 2013).  Thus, plaintiff does not sufficiently state a claim for failure to protect against defendants.

Accordingly, to the extent that plaintiff suggests that defendants intentionally opened his cell door, it is recommended that defendants' motion on this ground be granted.

### 5. Mental Health Callouts

Plaintiff suggests that defendants denied him mental health callouts in conjunction with his Eighth Amendment conditions of confinement claim.  <u>See</u> Am. Compl. ¶ 117.  As defendants note, plaintiff's claims against C.O. Savage, C.O. Kaiser, and C.O. Bogardus are encompassed in his Eighth Amendment medical indifference claim.  <u>See</u> Am. Compl. ¶ 84.  As such, this claim "is both derivative and duplicative" of plaintiff's claim that defendants were deliberately indifferent to his serious medical needs.  <u>Barnes</u>, 760 F. Supp. 2d at 302.  Accordingly, it is recommended that defendants' motion on this ground be granted.

### G. Retaliation

Plaintiff alleges that C.O. Savage, C.O. Kaiser, and C.O. Bogardus "manufactur[ed] security breaches," i.e., "opened [his cell] when it wasn't suppose[d] to have been opened"; denied him meals; and denied his mental callouts in retaliation for writing grievances.  <u>See</u> Am. Compl. ¶ 117.  Defendants argue that because plaintiff's

retaliation claims are "premise[d] . . . on the same conduct as [ ] his Eighth Amendment conditions of confinement claim . . . [p]laintiff has not sufficiently alleged that [d]efendants . . . took any adverse action against him."  Def. Mem. of Law at 23. Although the undersigned recommended that only plaintiff's Eighth Amendment claim as to the alleged denial of meals survive this motion, courts have held that "[t]he fact that [d]efendants' actions, or alleged inactions, do not amount to an Eighth Amendment violation does not preclude [a Court's] review of these retaliation claims."  Linares v. Kudlack, No. 9:03-CV-1408, 2007 WL 4287700, at *6 (N.D.N.Y. Dec. 4, 2007) (citing Soto v. Iacavino, No. 01 Civ. 5850 (JSM), 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003).

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]'"  See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002)).  A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face.  See Iqbal, 556 U.S. at 678; South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009).  "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'"  Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on

other grounds by Swierkiewicz, 534 U.S. at 560).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. The Second Circuit has concluded that use of the prison grievance system constitutes a protected activity. See Gill, 389 F.3d at 384; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro v. Gillespie, 791 F. Supp. 2d 353, 367 (S.D.N.Y. 2011) (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (same). As plaintiff alleges that he filed grievances concerning the defendants' alleged conduct, plaintiff satisfies the first prong of the test as he has engaged in a protected activity. See Am. Compl. ¶¶ 39, 69, 117; Gill, 389 F.3d at 384.

As to the second prong, an action is considered to be adverse if it "would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." Davis, 320 F.3d at 353. "Courts have repeatedly held that occasional deprivations of food are de minimis and do not rise to the level of adverse actions for purposes of a retaliation claim." Amaker v. Annucci, No. 14-CV-9692 (KMK), 2016 WL 5720798, at *5 (S.D.N.Y. Sept. 30, 2016), aff'd 721 F. App'x 82 (2d Cir. 2018) (summary order) (citing Hill v. Laird, No. 06-CV-126, 2014 WL 1315226, at *11 (E.D.N.Y. Mar. 31, 2014) (holding that the defendants' "refusal to give [the] [p]laintiff his food" on one occasion "[did] not rise to the level of adverse actions.")). However,

plaintiff contends that he was denied approximately 2,059 "nutritiously prepared mess[ ]hall meals" over the course of twenty-two months.  See Am. Compl. ¶¶ 74-78, 118.

Accepting plaintiff's allegations as true, the denial of over 2,000 nutritionally adequate meals amounts to more than a de minimis action.  But see Edwards v. Horn, No. 10-CV-6194, 2012 WL 760172, at *14 n.13 (S.D.N.Y. Mar. 8, 2012) ("The denial of meals on two occasions, separated by more than three months, is de minimis and not actionable." (italics omitted)); Snyder v. McGinnis, No. 03-CV-902, 2004 WL 1949472, at *11 (W.D.N.Y. Sept. 2, 2004) ("But even if the Court were to assume that the denial of food to the plaintiff on two occasions constituted acts of retaliation, the Court finds that the actions complained of were de minimis and not actionable; such actions, even if proven at trial, would not chill a person of ordinary firmness from continuing to engage in First Amendment activity.").

Moreover, with respect to causal connection between the protected activity and the adverse action, plaintiff suggests that such denial of meals began on July 15, 2015, one day after he filed his first grievance against C.O. Savage concerning his hair.  See Am. Compl. ¶¶ 33, 38, 74; see also Lindner v. Int'l Business Machines Corp., No. 06-CV-4751, 2008 WL 2461934, at *7 (S.D.N.Y. June 18, 2008) ("[R]etaliation claims are rarely dismissed pursuant to Rule 12(b)(6) where the plaintiff has alleged a time period of less than one year between the protected activity and the alleged retaliatory conduct").  Although C.O. Kaiser and C.O. Bogardus are not named in that grievance, courts have held that "[t]he fact that the defendants who allegedly retaliated against the plaintiff were not the subject of the grievance that is claimed to have precipitated that

[alleged conduct] does not necessarily negate the possibility that a reasonable fact finder could conclude that the two are linked." Gomez v. Graham, No. 9:14-CV-0201 (DNH/DEP), 2016 WL 8652781, *13 (N.D.N.Y. June 16, 2016). Thus, plaintiff has adequately pleaded that defendants retaliated against him by denying him meals, and it is recommended that defendants' motion on this ground be denied.

As to the opening of plaintiff's cell door, the undersigned reaches a different conclusion. Although plaintiff alleges that after he filed a grievance against C.O. Kaiser and C.O. Bogardus concerning the opening of his cell door, his "cell was opened up 6 times as much as before," Am. Compl. ¶ 69, "these alleged actions do not amount to the requisite "adverse action" that would deter a similarly situated inmate from attempting to assert his rights." Partak v. Behrle, No. 9:09-CV-1256 FJS/ATB, 2011 WL 7629500, at *18 (N.D.N.Y. Sept. 12, 2011), report and recommendation adopted 2012 WL 1037950 (N.D.N.Y. Mar. 27, 2012). The undersigned acknowledges that plaintiff has alleged that other inmates assaulted and threw fecal matter and urine at him, but there is no indication that these instances occurred after the filing of plaintiff's grievance in conjunction with the alleged continued opening of plaintiff's cell door. See Am. Compl. ¶ 117. As such, it cannot be said that defendants' opening of plaintiff's cell door amounts to adverse action, and it is recommended that defendants' motion on this ground be granted.

Finally, plaintiff alleges that defendants denied him his mental health call outs "because of plaintiff writing grievances and complaining to their ranking officers about them." Am. Compl. ¶ 117. "This bare assertion, without more, does not adequately

42

state a claim for First Amendment retaliation." Walker v. City of New York, 367 F.

Supp. 3d 39, 64 (S.D.N.Y. 2019) (concluding that the plaintiff's claims that the

defendants "denied him handicapped housing, denied him reasonable

accommodations, increasingly hindered [his] access to handicap housing and

assistance devices and auxiliary aids, and adequate medical care" failed to amount to a

First Amendment violation).  In order "[t]o show retaliation [in these circumstances,

plaintiff] was required to present evidence that his constitutionally protected conduct in

filing past grievances was a substantial or motivating factor for a prison official's

adverse action." Cole v. Fischer, 416 F. App'x 111, 113 (2d Cir. 2011) (citing Bennett v.

Goord, 343 F.3d 133, 137 (2d Cir.2003).  First, the allegations against these defendants

are conclusory.  Second, plaintiff does not allege when he filed grievances or how long

after the grievances were filed that the alleged retaliation occurred.  Accordingly, even

construing the facts in the light most favorable to plaintiff, he has failed to demonstrate

that filing grievances was a substantial factor in the alleged retaliation.  Thus, it is

recommended that defendants' motion on this ground be granted.


### III. Motion to Appoint Counsel

In a separately-filed motion, plaintiff also seeks the appointment of counsel.  Dkt.

No. 48.  Plaintiff indicates that his case is complex because it involves "several different

legal claims" and would "require discovery of documents and depositions of numerous

defendants and witnesses." Id. at 2.  Plaintiff argues that because he is incarcerated,

he is unable to further investigate the facts of his case, and he is no longer incarcerated at Great Meadows, where the alleged constitutional violations occurred.  Id. at 5.

It is well settled that "[a] party has no constitutionally guaranteed right to the assistance of counsel in a civil case."  Leftridge v. Connecticut State Trooper Officer No. 1283, 640 F.3d 62, 68 (2d Cir. 2011) (citations omitted).  In Terminate Control Corp. v. Horowitz, 28 F.3d 1335 (2d Cir. 1994), the Second Circuit reiterated the factors that a court must consider in ruling upon such a motion.  In deciding whether to appoint counsel, the court should first determine whether the indigent's position seems likely to be of substance.  If the claim meets this threshold requirement, the court should then consider a number of other factors in making its determination.  Id. at 1341 (quoting Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir. 1986)); see also Leftridge, 640 F.3d at 69 (noting that a motion for appointment of counsel may be properly denied if the court "concludes that [the party's] chances of success are highly dubious.") (citations omitted).  The factors to be considered in deciding whether or not to assign counsel include the following:

> 1. Whether the plaintiff's claims seem likely to be of substance;
>
> 2. Whether the plaintiff is able to investigate the crucial facts concerning his claim;
>
> 3. Whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder;
>
> 4. Whether the legal issues involved are complex; and
>
> 5. Whether there are any special reasons why appointment of

44

counsel would be more likely to lead to a just determination.

Hendricks v. Coughlin, 114 F.3d 390, 392 (2d Cir. 1997); see also Hodge v. Police

Officers, 802 F.2d 58 (2d Cir. 1986).  Moreover, prior to evaluating a request for an

appointment of counsel, the plaintiff must make a threshold showing that he is unable to

obtain counsel through the private sector or public interest firms.  See Cooper v. A.

Sargenti Co., Inc., 877 F.2d 170, 173-74 (2d Cir. 1989) (quoting Hodge, 802 F.2d at

61).

        Plaintiff has not alleged or proffered evidence demonstrating that he contacted

outside counsel or not-for-profit agencies in an effort to seek pro bono or low-cost

counsel.  Further, although plaintiff sets forth numerous causes of actions against the

defendants, it appears to the undersigned as though, at this early stage of the litigation,

plaintiff has been able to effectively litigate this action by filing motions and opposing

defendants' motions.  See Dkt. Nos. 1, 12, 44, 48.  Although the undersigned

acknowledges that there may be conflicting evidence implicating the need for

cross-examination at the time of the trial of this matter, as is the case in many actions

brought under 42 U.S.C. § 1983 by pro se litigants, "this factor alone is not

determinative of a motion for appointment of counsel."  Velasquez v. O'Keefe, 899 F.

Supp. 972, 974 (N.D.N.Y. 1995) (citation omitted).  Finally, this Court is unaware of any

special reason why appointment of counsel at this early stage would be more likely to

lead to a just determination of this litigation. Therefore, the undersigned finds that,

based on the existing record in this case, appointment of counsel is unwarranted at this

time. Plaintiff may only file another motion for appointment of counsel in the event that

he can demonstrate that, in light of specific changed circumstances, consideration of the above factors warrants the granting of such an application.  Plaintiff's request for counsel is therefore denied without prejudice.

## IV. Conclusion

**WHEREFORE**, for the reasons herein, it is hereby

**RECOMMENDED**, that defendants' Motion to Dismiss (Dkt. No. 33) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's claims against Mr. Jackson and Ms. Bellamy for lack of personal involvement;

(2) Insofar as it seeks dismissal of plaintiff's First Amendment free exercise claims against Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Mr. Scroggy;

(3) Insofar as it seeks dismissal of plaintiff's First Amendment establishment clause claims against Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Mr. Scroggy as to the religious exemption;

(4) Insofar as it seeks dismissal of plaintiff's First Amendment retaliation claims against C.O. Savage, C.O. Kaiser, and C.O. Bogardus as to the opening of his cell door and the denial of mental health callouts;

(5) Insofar as it seeks dismissal of plaintiff's Eighth Amendment conditions of confinement claim against C.O. Savage, C.O. Kaiser, and C.O. Bogardus as plaintiff's allegation that defendants denied him access to

46

programs and recreation and mental health callouts, as well as opening his cell door;

(6) Insofar as it seeks dismissal of plaintiff's Fourteenth Amendment equal protection claims against Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Mr. Scroggy,

the motion be **GRANTED**, and Mr. Jackson and Ms. Bellamy be dismissed from the action; and it is further

**RECOMMENDED**, that defendants' Motion to Dismiss (Dkt. No. 33) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's claims against Commissioner Sullivan for lack of personal involvement;

(2) Insofar it seeks dismissal of plaintiff's First Amendment establishment clause claims against Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Mr. Scroggy as to Rastafarian registration;

(3) Insofar as it seeks dismissal pursuant to qualified immunity as to plaintiff's establishment clause claim;

(4) Insofar as it seeks dismissal of plaintiff's First Amendment retaliation claims against C.O. Savage, C.O. Kaiser, and C.O. Bogardus as to plaintiff's allegations that defendants denied him nutritiously adequate meals;

(5) Insofar as it seeks dismissal of plaintiff's Eighth Amendment conditions of confinement claim against C.O. Savage, C.O. Kaiser, and C.O.

Bogardus as to plaintiff's allegations that he was confined in his cell and denied nutritiously adequate meals;

the motion be **DENIED**; and it is

**ORDERED**, that plaintiff's Motion to Appoint Counsel (Dkt. No. 48) be **DENIED**, but the denial is without prejudice and with opportunity to renew such request in the future should plaintiff demonstrate a change in circumstances; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

 **IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.[8]

Dated: June 18, 2019
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[8] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(C).