**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

THOMAS BRYANT,

Plaintiff,

     v.

CHRISTOPHER MILLER, et al.,

                    No. 9:18-CV-494
                    (GTS/CFH)

Defendants.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**APPEARANCES:**

Thomas Bryant
Plaintiff pro se

Attorney General for the             JORGE A. RODRIGUEZ, ESQ.
State of New York                 WILLIAM A. SCOTT, ESQ.
The Capitol                       Assistant Attorneys General
Albany, New York 12224
Attorneys for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

<b>REPORT-RECOMMENDATION AND ORDER[1]</b>

     Plaintiff pro se Thomas Bryant ("plaintiff"), a former inmate[2] who was, at all

relevant times, in the custody of the New York State Department of Corrections and

Community Supervision ("DOCCS") at Great Meadow Correctional Facility ("Great

_____

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2] The DOCCS's inmate locator website (http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ2/WINQ120, Department ID Number 02A5545), indicates that plaintiff was conditionally released to parole supervision on April 15, 2021, and plaintiff submitted a change of address showing a private address effective as of April 22, 2021.  See Dkt. No. 121.

Meadow C.F."), brings this action pursuant to 42 U.S.C. § 1983, alleging that

defendants,[3] Great Meadow C.F. Superintendent, Christopher Miller ("Supt. Miller");

former Great Meadow C.F. Administrative Sergeant, Marvin Hawk ("Sgt. Hawk"); Great

Meadow C.F. Correction Sergeant, Douglas Coonradt ("Sgt. Coonradt"); Senior

Offender Rehabilitation Coordinator at Great Meadow C.F., John Scroggy ("Scroggy");

and Great Meadow C.F. Correction Officers ("C.O.") Christopher Bogardus ("C.O.

Bogardus"), Noah Kaiser ("C.O. Kaiser"), and Michael Savage ("C.O. Savage")

(collectively, where appropriate, "DOCCS defendants")—who, at all relevant times, were

employed by DOCCS; and New York State Office of Mental Health ("OMH")

Commissioner, Ann Marie Sullivan ("Sullivan"); former Executor Director of the Central

New York Psychiatric Center ("CNYPC"), Deborah McCulloch ("McCulloch"); CNYPC

psychiatric nurse practitioner, Cheryl Meyers ("N.P. Meyers"); former OMH clinical

psychologist, Dr. John McCloskey ("Dr. McCloskey"); Director of Corrections-Based

Operations Risk Management at OMH Meaghan Bernstein ("Bernstein"); and OMH

Mental Health Program Specialist III in Customer Relations, James Steed ("Steed")

(collectively, where appropriate, "OMH defendants")—who, at all relevant times, were

employed by OMH—violated his constitutional rights under the First and Eighth

Amendments.  See Dkt. No. 12 ("Amen. Compl.").[4]

---

[3]  The undersigned notes that plaintiff's claims asserted against Sing Sing Correctional Facility employees Capra and Hickson were transferred, by Order of the Court, to the Southern District of New York.  See Dkt. No. 13 at 6.  In February 2021, the Southern District dismissed all claims asserted against those defendants with prejudice.  See Bryant v. Capra, No. 18-CV-10198 (KMK), 2021 WL 323263, at *5 (S.D.N.Y. Feb. 1, 2021).

[4]  On June 18, 2019, the undersigned issued a Report-Recommendation and Order  concerning defendants' partial motion to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  See Dkt. No. 49.  The undersigned recommended granting defendants' motion insofar as it sought dismissal of plaintiff's: (1) claims against former defendants Jackson and Bellamy for lack of personal involvement; (2) First Amendment Free Exercise Clause claims against Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt.

Presently pending before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). See Dkt. No. 109.   Plaintiff filed an opposition to defendants' motion insofar as it seeks dismissal of plaintiff's claims asserted against the OMH defendants.  See Dkt. No. 114.  Plaintiff filed a separate response in opposition to defendants' motion insofar as it seeks dismissal of plaintiff's claims against the DOCCS defendants.  See Dkt. No. 115. . Defendants filed a memorandum of law in reply to plaintiff's response, see Dkt. No. 118, and plaintiff filed a reply memorandum of law in further opposition.  Dkt. No. 119.  Also pending is plaintiff's requests that the Court reopen discovery pursuant to Fed. R. Civ.

---

Coonradt, and Scroggy; (3) First Amendment Establishment Clause claims against Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Scroggy insofar as his claim was based on the religious exemption provided under DOCCS Directive No. 4914, which allows only Rastafarian inmates to wear their hair under a religious head covering; (4) First Amendment retaliation against C.O.s Savage, Kaiser, and Bogardus concerning the opening of plaintiff's cell door and denial of mental health callouts; (5) Eighth Amendment conditions of confinement against C.O.s Savage, Kaiser, and Bogardus as to the alleged denial of access to programs and recreation, mental health callouts, and opening plaintiff's cell door; and (6) Fourteenth Amendment Equal Protection Clause claims against Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Scroggy; and recommended that Jackson and Bellamy be dismissed as defendants.  See Dkt. No. 49 at 46-47.  The undersigned recommended denying defendants' motion to dismiss insofar as it sought dismissal of: (1) the action against Sullivan for lack of personal involvement; (2) plaintiff's First Amendment Establishment Clause claims against Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Scroggy based on plaintiff's allegations that those defendants instructed plaintiff to register as a Rastafarian; (3) plaintiff's Establishment Clause claims based on qualified immunity; (4) First Amendment retaliation claims against C.O.s Savage, Kaiser, and Bogardus concerning plaintiff's allegations that defendants denied him nutritionally adequate meals in retaliation for plaintiff's July 14, 2015 grievance; (5) Eighth Amendment conditions of confinement claim against C.O.s Savage, Kaiser, and Bogardus as to plaintiff's allegations that he was confined in his cell and denied nutritionally adequate meals.  See id. at 47-49.

On September 10, 2019, Chief United States District Court Judge Glenn T. Suddaby accepted and adopted the undersigned's Report-Recommendation and Order in its entirety.  See Dkt. No. 51 at 9. Thus, the following of plaintiff's claims remain pending: (1) First Amendment Establishment Clause claim against Supt. Miller, C.O. Savage, Sgt. Hawk, Scroggy, and Sgt. Coonradt based on defendants' alleged instruction that plaintiff register as a Rastafarian; (2) First Amendment retaliation claim against C.O.s Savage, Kaiser, and Bogardus based on the alleged deprivation of nutritionally adequate meals in retaliation for plaintiff filing his July 14, 2015 grievance; (3) Eighth Amendment conditions of confinement claim against C.O.s Savage, Kaiser, and Bogardus based on plaintiff's alleged cell confinement and the deprivation of nutritionally adequate meals; and (4) Eighth Amendment medical indifference claims against (a) C.O.s Savage, Kaiser, and Bogardus for allegedly depriving plaintiff of mental health callouts; and (b) McColskey, Meyers, Bernstein, McCulloch, Steed, and Sullivan for allegedly failing to provide plaintiff with adequate mental health care.

P. 56(d).[5]  See Dkt. No. 114.  For the reasons that follow, it is recommended that defendants' motion be granted in its entirety and plaintiff's Amended Complaint be dismissed in its entirety with prejudice.  Further, for the reasons discussed below, plaintiff's request to reopen discovery pursuant to Fed. R. Civ. P. 56(d) is denied.

## I. Background

### A. Facts

The facts are reviewed in the light most favorable to plaintiff as the non-moving party.  See subsection III., infra.  At all relevant times, plaintiff was an inmate incarcerated at Great Meadow C.F.

### 1. Plaintiff's Amended Complaint

### a. First Amendment Establishment Clause Claim

Plaintiff states that he is 5'11" tall and wears his dreadlocks, which he has "been growing for approx. 24 years," at a length such that they "reach[] the floor either standing up or sitting down."  Amen. Compl. at 6 ¶ 29.  In June 2015, plaintiff states that he entered the mess hall at Great Meadow C.F. "with his hair in a ponytail."  Id. at ¶ 30. After receiving his meal, plaintiff "placed his hair around his waist and sat it in his lap to avoid it from coming into contact with the . . . floor" when he sat down.  Id.  While plaintiff was eating his meal, he "was approached by an officer, who told him 'he

---

[5]  Although labeled as a "cross motion" for summary judgment on the docket, the undersigned concludes that plaintiff's submission at Dkt. No. 114 is more accurately characterized as (1) an opposition to defendants' motion insofar as defendants seek summary judgment as to plaintiff's claims against the OMH defendants, and (2) a request to reopen discovery pursuant to Fed. R. Civ. P. 56(d).  Indeed, at no point in this submission does plaintiff request that the Court grant summary judgment in his favor; rather, plaintiff asks that the Court "dismiss" and "set aside defendant's [sic] summary judgment motion."  Dkt. No. 114 at 1, 2 (capitalization omitted).

couldn't have his hair like this,' knowing or should have been known [sic] to do otherwise would have plaintiff's hair on the floor." Id. at ¶ 31. "Because of this confrontation, plaintiff did not enter into the mess[]hall again with his hair in a ponytail." Id. at ¶ 32.

On July 14, 2015, C.O. Savage approached plaintiff on his way to the mess hall and inquired about "his hair being wrapped up without a religious hair covering on it." Amen. Compl. at 8 ¶ 33. C.O. Savage gave plaintiff a direct order "'not to come out [of] his cell with his dredlocks [sic] wrapped on the top of his head without a religious hair covering on it' even after plaintiff informed him that he[ was] not religious/Rastafarian." Id. at ¶ 34. Because plaintiff was unwilling to change his religion to Rastafarian in order to wear the religious hair covering, he "remained in his cell as he was ordered by [C.O.] Savage." Id. at ¶ 35. Plaintiff states that he "had received numerous misbehavior reports in the past" for failing to adhere to DOCCS guidelines regarding his hair. See id. at ¶ 36. Faced with what plaintiff describes as "Hobson's Choice," he decided to remain confined in his cell and not change his hairstyle. Id. at ¶ 38. Later that day, plaintiff filed a grievance as to C.O. Savage's alleged conduct. See id. ¶ 39; Dkt. No. 12-1 at 7-8 (Grievance No. GM-59784-15).

On July 16, 2015, plaintiff wrote a letter to Supt. Miller, "requesting that he revoke [C.O.] Savage's order until the matter was resolved by the inmate grievance program." Amen. Compl. at 8 ¶ 40; see Dkt. No. 12-1 at 9. Plaintiff alleges that Supt. Miller did not respond, which caused plaintiff to remain "wrongly confined to his cell." Id. at ¶ 41. Plaintiff contends that, while he was confined in his cell as a result of C.O. Savage's order, he did not receive any mess[]hall meals[.]" Id. at ¶ 42.

Plaintiff states that he informed his family and friends about "what was going on with him" and that "[t]hey . . . contacted the facility informing them that plaintiff's needs [were not] being met." Amen. Compl. at 8  43.  In response to inquiries from plaintiff's family and friends, C.O. Savage and Scroggy visited plaintiff at his cell, at which time "plaintiff explained the situation . . . about his hair and [C.O.] Savage's direct order that wrongfully confined him." Id. at 9 ¶ 45.  "While plaintiff and . . . Scroggy were speaking, [C.O.] Savage interjected" and stated, "we can't just allow inmates to do what they want!" Id. at ¶ 46.  Plaintiff alleges that, "[a]fter hearing plaintiff and [C.O.] Savage out, . . . Scroggy informed plaintiff that 'he had to cut his hair, or change his religion to Rastafarian, in order to wear a crown as instructed by [C.O.] Savage and this will go away.'" Id. at ¶ 47.  Plaintiff avers that, "even when faced with outside agencies inquiring into the well being of plaintiff's health and mind state, [Scroggy] reiterated [sic] that all [p]laintiff had to do was cut his hair or change his religion to the Rastafarian faith in order to wear a crown and this problem would go away." Id. ¶ 49.

Sgt. Coonradt, the supervising sergeant of plaintiff's housing unit, conducted an investigation into plaintiff's allegations, and listened to plaintiff's complaints of being wrongfully confined for his hair and being deprived of meals.  See Amen. Compl. at 10 ¶ 50.  "Sgt. Coonradt gave plaintiff a highlighted copy of [DOCCS Directive] 4914 and told him that "[C.O.] Savage was right and if [plaintiff] wanted out of this compliance was key.'" Id.; see Dkt. No. 12-1 at 33.  Sgt. Coonradt submitted a memorandum dated August 7, 2015, to IGPS S. Pelo concerning plaintiff's Grievance (No. GM-59, 784-15), in which he stated that "what [plaintiff] [wa]s requesting in his grievance is a clear violation of directive 4914 Inmate grooming standards.  The Fact that [C.O.] Savage

enforced department policy is in no way harassment." Dkt. No. 12-1 at 32.  As Sgt. Coonradt's memorandum and plaintiff's letter to Supt. Miller make clear, plaintiff was requesting to be allowed to wear his dreadlocks wrapped on top of his head without a religious covering.  See id. at 9, 32.

On August 17, 2015, the Inmate Grievance Review Committee ("IGRC") denied plaintiff's grievance request to wear his hair on top of his head, noting in its decision that DOCCS Directive 4914 "specifically addresses dreadlock hair, and instructs that such hair must be tied back, or worn in a crown.  There are no provisions allowing grievant to wrap his hair on top of his head, unless it is under a religious crown." Dkt. No. 12-1 at 14.  Plaintiff appealed the IGRC's determination to Supt. Miller, who denied the grievance on September 1, 2015.  See id. at 15.  Plaintiff appealed defendant Miller's decision to the Central Office Review Committee ("C.O.R.C.").  See id.

On March 16, 2016, plaintiff submitted another grievance to the IGRC at the direction of a C.O.R.C. Grievance Supervisor.  See Dkt. No. 12-1 at 16.[6]  Plaintiff's Grievance (No. GM-60782-16) requested that he "be allowed to wrap [his] hair up or be allowed to wear a non-religious hat or scarf on [his] hair so [that he is] able to go to the mess[]hall, yard, and programs and not be subjected to unsanitized [sic] and other harmful environments."  Id. at 17.  Plaintiff's grievance also requested, as relevant here, that he "be afforded 3 meals a day and an opportunity for out of cell participation in programs and recreation."  Id.

---

[6]  Plaintiff's March 16, 2016 letter indicates that personnel at C.O.R.C. informed him in March 2016 that his appeal for Grievance No. GM-59, 784-15 "was not received or misplaced," and that because six months had passed, he could not re-submit his appeal to C.O.R.C.  Dkt. No. 12-1 at 16.  Therefore, plaintiff states, C.O.R.C. personnel "advised that [plaintiff] write another grievance about the same incident involving [his] hair."  Id.

On March 21, 2016, the IGRC acknowledged receipt of plaintiff's Grievance (No. GM-60782-16).  Dkt. No. 12-1 at 18.  On May 16, 2016, the IGRC denied plaintiff's March 21, 2016 grievance.  See id. at 19.  On May 18, 2016, plaintiff appealed the IGRC's determination to Supt. Miler.  See id.  On May 23, 2016, Supt. Miller denied the grievance.  See id. at 20.  On May 27, 2016, plaintiff appealed defendant Miller's denial to C.O.R.C.  See id.  On December 14, 2016, C.O.R.C. issued a decision upholding Supt. Miller's determination.  See id. at 22.  In April 2017, Sgt. Hawk conducted a further investigation into plaintiff's complaints, and advised plaintiff by letter that, "[a]fter consultation of [DOCCS] directives and facility ministerial staff[,] the only way for you to legally possess and wear a Tsalot Kob[7] due to your having dreadlocks is for you to be a registered member of the Rastafarian religion."  Dkt. No. 12-1 at 28; see Amen. Compl. at 12 ¶ 57.

Plaintiff alleges that C.O. Savage, Supt. Miller, Sgt. Hawk, Sgt. Coonradt, and Scroggy "issued orders and/or ruled on plaintiff's grievances in a way that would force and/or encourage him to be a member of the Rastafarian religion so he could wear their religious hair covering in order to wrap his dredlocks [sic] up even after becoming aware that plaintiff [was] non-religious and didn't want to practice the tenets of any religion." Amen. Compl. ¶ 114.  Liberally construed, plaintiff alleges that C.O. Savage, Supt. Miller, Sgt. Hawk, Sgt. Coonradt, and Scroggy violated his constitutional rights under the First Amendment Establishment Clause.

---

[7] Defendants point out that "[a] tsalot-kob, otherwise known as a Rastafarian crown, is an approved religious head covering that members of the Rastafarian faith are permitted to wear over their dreadlocks."  Dkt. No. 109-26 at 10 n. 1.

### b. First Amendment Retaliation and Eighth Amendment Conditions of Confinement—Denial of Nutritionally Adequate Meals

Plaintiff alleges that, while confined to his cell based on C.O. Savage's order concerning his dreadlocks, he was not provided "mess[ ]hall meals for breakfast, lunch[,] and dinner." Amen. Compl. at 13 ¶ 62. Plaintiff posits that "[C.O.s] Savage, Bogardus, and Kaiser . . . were aware that plaintiff wasn't coming out of his cell for chow . . . after being instructed not to; because these . . . defendant[s] . . . took the 'Go around' acknowledging him not coming out of his cell." Id. at 14 ¶ 64. Plaintiff explains that the "Go around Slip" is an account of "which inmates are left in their cells and those who left their cells for chow . . . ." Id. at 13 ¶ 60.

From July 15, 2015, through April 5, 2016, plaintiff alleges that he "missed approx. 634 meals." Amen. Compl. at 19 ¶ 74. Plaintiff contends that he only received three complete nutritious meals on three consecutive days during that time period when non-party Dr. Karandy issued him a feed in cell pass. See id. From April 6, 2016 through October 11, 2016, plaintiff alleges that he "missed approx. 567 meals." Id. at ¶ 75. Plaintiff states that he only "ate 1 complete nutritious meal" when the facility locked down on August 30, 2016. Id. From October 22, 2016, through July 20, 2017, when he transferred from Great Meadows, plaintiff alleges that he missed approximately 849 meals. Id. at 20 ¶ 76. Plaintiff posits that he only received one breakfast meal during that time period. See id. Plaintiff alleges that he developed stomach pains and headaches, and lost energy, motivation and a "substantial amount of [weight]" from the lack of food. Id. at ¶ 77. Plaintiff suggests that he sold his personal property to other inmates in order to obtain food. See id. ¶¶ 77-78. Plaintiff states that he was "periodically" allowed to go to the commissary. Id. at ¶ 79.

Plaintiff contends that C.O. Savage, C.O. Bogardus, and C.O. Kaiser did "not provid[e] him nutritiously prepared meals from the mess[]hall . . . because . . . plaintiff wr[ote] grievances and complain[ts] to their [r]anking officers about them[,]" in violation of "plaintiff's rights to be free from [r]etaliation under the [First] Amendment[.]"  Amen. Compl. at 30 ¶ 117.  Plaintiff further avers that C.O. Savage, C.O. Bogardus, and C.O. Kaiser "deprived [him] of . . . approximately 2,059 nutritiously prepared mess[ ]hall meals over a time span of 22 months, causing [plaintiff] to lose a substantial amount of [weight], (suffering) stomach pains, headaches, dizzy spells, lack of energy and motivation, breaking out with rashes and depression[.]"  Am. Compl. at 30 ¶ 118. Liberally construed, the foregoing allegations contained in the Amended Complaint allege that C.O. Savage, C.O. Bogardus, and C.O. Kaiser violated plaintiff's First and Eighth Amendment rights because retaliated against plaintiff for filing grievances and complaints against them by depriving him of nutritionally adequate meals.

### c. Eighth Amendment Medical Indifference

Plaintiff states that, "[t]hroughout his incarceration[, he was] actively . . . on the OMH case load and ha[d] been receiving treatment for severe mental illness and/or severe personality disorder . . . .  At all times mentioned[, p]laintiff was designated an OMH Level 2-8."  Amen. Compl. at 22 ¶ 87.  Plaintiff states that he "is diagnosed with Anti-Social Personality disorder and intermittent explosive disorder."  Id. at ¶ 88 (internal quotation marks omitted).  Plaintiff states that he "has been known to hurt himself when feeling depressed, stressed, agitated or when things isn't [sic] going his way."  Id. at 23 ¶ 88.  Plaintiff states that, "[p]rior to his arrival to [Great Meadow C.F.] in March 2015,

[he] was housed in a 'Residential Mental Health Unit' ('R.M.H.U.')[,]" which he explains "is an OMH, CNYPC and DOCCS jointly operated therapeutic facility that provide [sic] patients/inmates who's [sic] designated level 1-5 and 2-8, suffering from a severe mental illness and/or personality disorder with out of cell treatment and programming while serving SHU time."  Id. at 23 ¶ 89.

### i. C.O.s Savage, Bogardus, and Kaiser—Denial of Mental Health Callouts

Plaintiff alleges that he cut himself in front of Bogardus and Kaiser, both of whom "left without getting plaintiff any medical and mental health treatment."  Amen. Compl. at 21 ¶¶ 81, 82.  Plaintiff also contends that C.O.s Savage, Bogardus, and Kaiser denied him mental health callouts between July 14, 2015, and May 2016.  See id. at ¶ 84.  In particular, plaintiff lists fourteen separate dates between February 5, 2016, and May 24, 2017, when he alleges that C.O.s Savage, Bogardus, and Kaiser denied him mental health callouts.  See id. at 21-22 ¶ 85.  Plaintiff alleges that these defendants "were denying [him] his MHU callouts so he couldn't report what was going on with him even after witnessing it or made [sic] aware that plaintiff mutilated himself and/or wasn't coming out of his cell for . . . chow . . . ."  Id. at 21 ¶ 84.  Liberally construed, plaintiff's Amended Complaint alleges a claim of deliberate medical indifference in violation his Eighth Amendment rights against C.O.s Savage, Bogardus, and Kaiser.

### ii. OMH Defendants—Failure to Provide Adequate Mental Health Treatment

Plaintiff states that Dr. McCloskey was his therapist, and that he "notified . . . [Dr.]McCloskey and N.P. Meyers about the officer's wrongdoing and violative actions . . . . which caused [him] to remain cell confined (for approx. 22 months) because of his

unwillingness to comply with Dir. 4914 and the direct conflict it produced regarding his long length hair." Amen. Compl. at 23 ¶ 91. Plaintiff states that he also informed Dr. McCloskey and N.P. Meyers about his unwillingness to "change his religion" or "wear[] any religious hair coverings" and about Great Meadow C.F. personnel "not allowing him to come meet with them for scheduled appointments, nor providing him with 3 meals a day[.]" Id. at ¶¶ 90, 92. Plaintiff denies singing any refusal forms for mental health callouts. See id. at 24 ¶ 93.

Plaintiff contends that Bernstein, McCulloch, Steed, and Sullivan "were made aware of [his] circumstances via his numerous filed complaints" in which he "addressed specifically . . . not receiving adequate mental treatment." Amen. Compl. at 24 ¶ 94. Plaintiff alleges that he had, "at one time or another, either in person or by way of letter[,]" made requests to Dr. McCloskey, N.P. Meyers, Bernstein, McCulloch, Steed and Sullivan to "be placed in a Tri-Immediate care program (Tri-ICP) or Immediate care Program (ICP), so he c[ould] be in a therap[e]utic environment where all inmates is [sic] designated as level 1-s or 2-s, receives mental health treatment, program and get medication together, and was denied." Id. at 24 ¶ 95. Plaintiff contends that "[a]t no time did" any of those defendants "put [him] in to see the medical department; nor any referrals to be seen by [mental health] nurses to take his vital signs or have him weighed as he complained of a substantial amount of w[]eight loss." Id. at 24-25 ¶ 96. Liberally construing the pro se Amended Complaint, plaintiff alleges claims of deliberate medical indifference in violation of his Eighth Amendment rights against McCloskey, Meyers, Bernstein, McCulloch, Steed, Sullivan for their purported failure to provide plaintiff with adequate mental health care.

## II. Present Motions

## A. Defendants' Motion for Summary Judgment

### 1. Exhaustion of Administrative Remedies—C.O. Bogardus and C.O. Kaiser

Defendants contend that the Amended Complaint must be dismissed as to C.O. Bogardus and C.O. Kaiser for failure to exhaust administrative remedies. See Dkt. No. 109-26 at 38.[8]   In particular, defendants aver that the summary judgment record establishes that plaintiff did not file any grievance or administrative appeal concerning his pending claims against those defendants. See id.  In support of this contention, defendants first proffer the declaration of non-party Alexandria Mead ("Mead"), the IGP Supervisor at Great Meadow C.F.  See Dkt. No. 109-23 at 1 ¶ 2.  Mead declares that "Great Meadow C.F. has a fully functional IGP by which inmates can file grievances," that is set forth in "NYCRR Title 7 and [DOCCS Directive #4040."  Id. at 2 ¶ 5.  Mead states that that both "NYCRR Title 7 and [DOCCS Directive #4040 are available in the facility's law library."  Id.  Further, Mead explains that, "[o]nce an inmate grievance is determined to be timely, it is logged, coded, and titled."  Id. at ¶ 7.  Moreover, Mead states that "[a]ll documents, or copies thereof, related to a particular grievance, including the grievance as well as investigations and appeals, are stored in the Great Meadow C.F. grievance office in the regular course of that office's activities as they are created or received."  Id. at ¶ 9.

Mead explains that all documents relating to inmate grievances are kept on file at Great Meadow C.F. for four years such that, as of the date of her declaration, November 30, 2020, "[a]ny grievances filed by [p]laintiff prior to January 1, 2016 ha[d]

---

[8]  These defendants asserted failure to exhaust administrative remedies as an affirmative defense in their Answer to plaintiff's Amended Complaint.  See Dkt. No. 53 at 4 ¶ 17.

13

been destroyed." Dkt. No. 109-23 at 3 ¶ 9. She states that the claims asserted in plaintiff's Amended Complaint "are a proper subject for a grievance under the IGP," id. at ¶ 12, and that "[i]f plaintiff filed a grievance related to these claims after January 1, 2016, while incarcerated at Great Meadow C.F., there would be a record of such grievance in the grievance files maintained at the facility." Id. at ¶ 11. However, Mead states, that "[u]pon review of the records maintained in the grievance office at Great Meadow C.F., [p]laintiff[] did not file any grievances related to the incidents alleged" in his Amended Complaint. Id. at ¶ 13. Attached as an exhibit to Mead's declaration is a computer printout of the IGP database, which reflects her search of plaintiff's grievance files, and indicates that, after January 1, 2016, plaintiff filed only one grievance for lack of receipt of a package, but not the claims asserted in his present action. See id. at 6-7.

Further, defendants proffer the declaration of Rachael Seguin ("Seguin"), DOCCS Assistant Director of the IGP. See Dkt. No. 109-24 at 1 ¶ 1. Seguin explains that her duties as Assistant Director of the IGP include "maintaining records of appeals of grievances filed by incarcerated individuals. Specifically, [she] oversee[s] the records that DOCCS maintains of appeals received by the [CORC]. Which is the final level of administrative review in the IGP." Id. at ¶ 2. Seguin declares that the claims asserted in plaintiff's Amended Complaint "are the proper subject for a grievance under DOCCS grievance procedure as outlined at 7 NYCRR § 701 et set." Id. at 3 ¶ 11. Further, Seguin explains that, pursuant to the grievance procedure set forth in 7 NYCRR § 701 et set., "CORC is the final appellate level" of review. Id. at ¶ 8; see id. at 2 ¶ 7. Moreover, Seguin indicates that, "CORC maintains files of grievance appeals received by CORC" "for the current year and the previous four calendar years." Id. at 4 ¶ 12.

14

Seguin declares that she conducted "a diligent search of CORC records for all appeals received from facility-level grievance determinations pertaining to [p]laintiff." Dkt. No. 109-24 at 4 ¶ 15.  Attached to Seguin's declaration as an exhibit is a "copy of the computer printout from the CORC database reflecting the results of [her] search, as of November 24, 2020, which was created and maintained in the usual course of business at CORC[,]" id. at 4 ¶ 15.  Seguin states that her search results evidence that

> CORC did not receive, nor has it ever received, any appeals from [p]laintiff regarding his allegations that [d]efendants (1) prevented [p]laintiff from receiving nutritiously adequate meals; (2) prevented [p]laintiff from accessing the Great Meadow mess[]hall; (3) prevented [p]laintiff from attending mental health callouts; and (4) confined [p]laintiff to his cell, while [he] was housed at Great Meadow from June 2015 through August 2017.

Id. at 5 ¶ 16.

In addition, defendants cite to exhibit F attached to Sgt. Coonradt's declaration, which contains a correspondence from IGP Supervisor S. Pelo to the Office of the Superintendent, dated August 24, 2015, and states that "[t]he attached grievance appeals require a response from the Superintendent[,]" including "59, 784-15" with the notation "N" next to that grievance number.  Dkt. No. 109-14 at 6.  Exhibit F to Sgt. Coonradt's declaration also contains copies of plaintiff's Grievance No. GM-59784-15 and Grievance No. GM-60782-16, and related IGRC, IGP Superintendent, and administrative appeal documents.  See id. at 7-28.  Moreover, defendants submit the declarations of C.O. Bogardus and C.O. Kaiser, which both indicate that those defendants were not aware that plaintiff had filed a grievance with respect to their conduct.  Dkt. No. 109-15 at 2 ¶ 15 (C.O. Bogardus' declaration); Dkt. No. 109-16 at 2 ¶ 25 (C.O. Kaiser's declaration).

## 2. Personal Involvement—Sullivan, Supt. Miller, and Sgt. Coonradt

### a. Sullivan

Defendants contend that the Amended Complaint must be dismissed insofar as asserted against Sullivan for lack of personal involvement.  See Dkt. No. 109-26 at 34-35.  In particular, defendants aver that plaintiff has failed submit proof to establish Sullivan's involvement beyond merely receiving plaintiff's complaints concerning his mental health treatment, which defendants posit is insufficient to establish personal involvement pursuant to Section 1983.  See id. at 35.  Further, defendants submit Sullivan's declaration in which she states that, "[a]s the Commissioner of OMH [she] had no personal involvement in [plaintiff's Eighth Amendment medical indifference] allegations."  Dkt. No. 109-22 at 2 ¶ 4.  Sullivan explains that "[a]ll letters of complaint that are addressed to [her] are forwarded to OMH Risk Management for investigation and reply" and that "[i]f a patient disagrees with Risk Managements [sic] findings and is incarcerated and receiving OMH services through a DOCCS facility, the inmate patient may appeal Risk Management's determination to the Executive Director of [CNYPC]."  Id. at ¶ 5.  In the event that an inmate patient wants to appeal the Executive Director of CNYPC's determination, "he may appeal to the office of OMH Customer Relations to exhaust his claims."  Id.  Based on the foregoing, Sullivan declares that she "has no personal role in addressing or answering complaints filed by OMH patients or inmate patients" and "did not review [p]laintiff's OMH complaint, investigate the allegations made therein, or review the findings or conclusions made by other OMH personnel regarding the said allegations."  Id. at ¶¶ 6, 7.  Similarly, Sullivan explains, she "had no authority to direct any DOCCS employees to undertake or abstain from any actions."  Id.

at ¶ 8.  Thus, defendants aver, Sullivan was not personally involved in the alleged Eighth Amendment medical indifference claims.

### b. Supt. Miller

Defendants aver that plaintiff cannot establish Supt. Miller's personal involvement in any of the alleged constitutional violations asserted against him because the record evidence establishes only that Supt. Miller affirmed determinations of the IGRC with respect to plaintiff's grievances.  See Dkt. No. 109-26 at 35-36.  Specifically, defendants point out "that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement."  Id. at 35 (internal quotation marks and citations omitted).  Defendants point to Supt. Miller's declaration in which he explains that his role with respect to plaintiff's grievances was limited to reviewing plaintiff's grievances and affirming the IGRC's determinations.  See Dkt. No. 109-19 at ¶¶ 6-8, 12.  Thus, defendants posit, plaintiff's Amended Complaint must be dismissed insofar as asserted against Supt. Miller for lack of personal involvement.

### c. Sgt. Coonradt

Similarly, defendants contend that Sgt. Coonradt's involvement was limited to investigating plaintiff's grievances, which defendants posit is an insufficient basis to establish personal involvement under Section 1983.  See Dkt. No. 109-26 at 36.  In support of this contention, defendants point to Sgt. Coonradt's declaration, in which he explains that, as part of his "dut[y] as the A-Block supervising area sergeant . . . was to investigate complaints regarding [his] area."  Dkt. No. 109-14 at 2 ¶ 5.  Sgt. Coonradt

states that he "was assigned to investigate [p]lainitff's grievance GM-59784-15 by the [IGP] Supervisor on August 4, 2015[,]" and plaintiff's "grievance GM-60782-16 in March 2016." Id. at ¶ 6.  Aside from investigating plaintiff's grievances, Sgt. Coonradt declares that he "had no further involvement with respect to the allegations [i]n [p]laintiff's [Amended] Complaint." Id. at 3 ¶ 15.  Therefore, defendants aver that the Amended Complaint must be dismissed as to Sgt. Coonradt for lack of personal involvement.

### 3. Merits

### a. First Amendment Establishment Clause

Defendants argue that plaintiff's First Amendment Establishment Clause claim alleging that Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Scroggy attempted to coerce plaintiff into registering as a member of the Rastafarian faith lacks merit.  See Dkt. No. 109-26 at 6.  Defendants point out that DOCCS Directive 4914 did not permit inmates to wear their hair in the style desired by plaintiff, that is, with dreadlocks wrapped up on top of their head without an approved fastening device.  See id.  However, defendants point out, DOCCS Directive 4914 contained an exception that allowed Rastafarian inmates to "wear their dreadlocks in an approved religious head covering." Id. (quoting DOCCS Directive 4914, reproduced at Dkt. No. 109-14 at 29). Further, citing plaintiff's deposition testimony, defendants note that, although "[p]laintiff was aware that he was able to cut his hair to come into compliance with DOCCS grooming standards[,]" for his "own personal reasons—not due to any decree or action by any named [d]efendant—[plaintiff] refused to cut his hair." Id. at 7 (citing Dkt. No. 109-8 at 36).  Moreover, defendants point out that plaintiff testified at deposition that he

would have been able to comply with DOCCS Directive 4914 if he had "tie[d] [his] dreads into a ponytail that still went to the back rather than pinned to the top of [his] head," in what he referred to as a "natural crown," then he "would . . . have been able to leave [his] cell."  Dkt. No. 109-8 at 53.  Defendants also point out that plaintiff testified that "the only way that [he] could not have left the cell was if [he] tied [his dreadlocks] up to the back of [his] head without a religious covering."  Id.  Thus, defendants aver, plaintiff remained in his cell due solely to his refusal to style his hair in compliance with DOCCS Directive 4914 and/or cut his hair.  See Dkt. No. 109-26 at 7.

Defendants cite to C.O. Savages declaration in which he states that he did not ever seek to compel plaintiff to register as a Rastafarian.  See Dkt. No. 109-26 at 7 (citing Dkt. No. 109-20 at 2 ¶ 7).  In his declaration, C.O. Savage states that he was not regularly assigned to plaintiff's housing unit at Great Meadow C.F. and that "[t]he only interaction [he] recall[ed] with [p]laintiff was sometime in June or July 2015, when, after escorting inmates to the mess hall, [p]laintiff sat down and [C.O. Savage] noticed his long dead-locked hair was on the floor."  Dkt. No. 109-20 at 2 ¶ 6.  C.O. Savage states that he informed plaintiff that "his hair was not allowed to touch the floor" and that, in response, "[p]laintiff asked if he needed to have a religious head covering in order to wear his hair atop his head."  Id.  C.O. Savage told plaintiff that "per DOCCS Directive 4914, he was required to wear a religious covering in order to wear his hair atop his head."  Id.  However, C.O. Savage indicates that "[t]he conversation was not confrontational," and states that he "did not issue any direct order that [p]laintiff stay in his cell or otherwise prevent him from leaving his cell."  Id. at ¶¶ 6, 9.  In addition, C.O.

Savage states that he "did not require [p]laintiff to register as a Rastafarian or to cut his hair." Id. at ¶ 7.

Defendants also proffer Scroggy's declaration, which states that, "[a]lthough [he] was not [p]laintiff's counselor . . ., as supervising counselor [he] spoke to [p]laintiff at his cell when it was brought to [his] attention that [p]laintiff had questions regarding the inmate grooming standards outlined in DOCCS Directive 4914." Dkt. No. 109-21 at 2 ¶ 5. Scroggy declares that he "advised [p]laintiff that he needed to cut or style his hair in a manner that complied with DOCCS policy." Id. at ¶ 6. In particular, Scroggy states, he "advised [p]laintinff that tying his hair to the top of his head was in violation of DOCCS policy" and "that, in order to comply with DOCCS policy, he had the option to request a waiver, on the basis of a religious accommodation granted to members of the Rastafarian faith, which would allow him to tie his hair to the top of his head, so long as it was covered with an approved religious covering, or to cut his hair." Id. Scroggy denies "require[ing] [p]laintiff to register as a Rastafarian or to cut his hair." Id. at ¶ 7. Further, Scroggy indicates that, despite his advice, "[p]laintiff refused to comply with DOCCS policies regarding the grooming of his hair" and that, "[a]lthough [p]laintiff alleged he was confined to his cell, he was under no disciplinary sanctions and any confinement to his cell was self-imposed." Id. at ¶¶ 8, 9.

Defendants aver that Sgt. Coonradt investigated plaintiff's grievances concerning his dreadlocks and concluded that C.O. Savage was correct that, pursuant to DOCCS Directive No. 4914, plaintiff was not allowed to wear his dreadlocks wrapped on top of his head without a religious covering. See Dkt. No. 109-26 at 9; Dkt. No. 109-14 at 2 ¶ 10. Defendants note that, in his declaration, Sgt. Coonradt states that, based upon his

investigation of plaintiff's grievances, "plaintiff was under no disciplinary sanction nor was he confined in any way or unable to attend commissary, recreation, and mental health call outs as he wished, and that any confinement was self-imposed. Dkt. No. 109-14 at 3 ¶ 12, 27; see Dkt. No. 109-26 at 9; Dkt. No. 109-14 at 27. Aside from conducting his investigation and issuing his findings to the IGRC, defendants posit that Sgt. Coonradt had no involvement in the alleged Establishment Clause violation. See Dkt. No. 109-26 at 9.

Defendants contend that Sgt. Hawk's only involvement with plaintiff's grievances consisted of "investigat[ing] the matter by consulting the relevant DOCCS directive and ministerial staff" and issuing plaintiff a report in response to plaintiff's inquiry in which he concluded that "the only way for [plaintiff] to legally possess and wear a Tsalot Kob . . . [wa]s for [him] to be a registered member of the Rastafarian religion." Dkt. No. 109-13 at 6. Relying on Sgt. Hawk's declaration, defendants aver that "[a]t no time did [he] issue any order directing that [p]laintiff wear his hair in any particular manner or remain in his cell." Dkt. No. 109-13 at 2 ¶ 13. Moreover, defendants contend that, insofar as plaintiff claims that Supt. Miller attempted to coerce him into registering as a Rastafarian by denying plaintiff's grievances challenging DOCCS Directive 4914, he fails to establish a First Amendment violation. See Dkt. No. 109-26 at 10. Defendants reassert that plaintiff has failed to establish Supt. Miller's personal involvement. See id. at 11.

### b. First Amendment Retaliation

Defendants contend that plaintiff's First Amendment retaliation claim against C.O.s Savage, Bogardus, and Kaiser lacks merit, as it is speculative and belied by the

admissible documentary evidence.  See Dkt. No. 109-26 at 11-12.  Defendants aver that the record is devoid of evidence establishing that C.O.s Bogardus or Kaiser knew of any grievances filed against C.O. Savage, or that they acted with the intention to retaliate against plaintiff based thereon, and reiterate that the record is devoid of evidence that plaintiff filed any grievance against C.O. Kaiser or C.O. Bogardus.  See id. at 11, 12.  Pointing to C.O. Savage's, C.O. Kaiser's, and C.O. Bogardus', declarations, defendants note that these defendants deny preventing plaintiff from obtaining nutritionally adequate meals, or retaliating or being instructed to retaliate against plaintiff in any way.  See Dkt. No. 109-20 at 3 ¶¶ 13, 15; Dkt. No. 109-16 at 2, 3 ¶¶ 12, 16, 17; Dkt. No. 109-15 at 2, 3 ¶¶ 12, 16, 17.

### c. Eighth Amendment Conditions of Confinement

First, defendants contend that the admissible evidence of record belies plaintiff's unsupported allegations that C.O. Savage confined plaintiff to his cell.  See Dkt. No. 109-26 at 12.  In particular, defendants point out that plaintiff was under no disciplinary sanction requiring him to remain in his cell.  See id. at 13.  Defendants note that Supt. Miller and Sgt. Coonradt, as well as the IGRC and CORC, "found that no order had been issued requiring [p]laintinff's confinement in his cell and that such confinement was self-imposed."  Id. (citing Dkt. No. 109-19 at 2 ¶ 10; Dkt. No. 109-14 at 3 ¶ 12, 19, 25, 27).  Defendants also note that plaintiff was admittedly aware that cutting his hair or tying it in a ponytail without pinning it to his head would have made his dreadlocks compliant with DOCCS Directive 4914, but, instead, chose to remain inside his cell.  See id. at 12-13; Dkt. No. 109-8 at 36, 51.  Further, defendants cite plaintiff's deposition

testimony in which plaintiff stated only that C.O. Bogardus and C.O. Kaiser left him in his cell and failed to intervene on his behalf.  See id. at 13 (citing Dkt. No. 109-8 at 84). Moreover, defendants cite C.O. Savage's. C.O. Bogardus', and C.O. Kaiser's declarations in which those defendants all deny ordering plaintiff to remain in his cell or denying plaintiff meals.  See Dkt. No. 109-20 at 2, 3 ¶¶ 9, 13; Dkt. No. 109-15 at 2 ¶¶ 10, 12; Dkt. No. 109-16 at 2 ¶¶ 10, 12.

### d. Eighth Amendment Deliberate Medical Indifference
### i. C.O.s Savage, Kaiser, and Bogardus

Defendants contend that "[t]he admissible evidence indicates that [C.O.s] Savage, Kaiser and Bogardus were not aware that [p]laintiff suffered from any medical condition, or that he was refusing to leave his cell, and that they did not prevent [p]laintiff from attending any mental health call outs."  Dkt. No. 109-26 at 14. Defendants cite the portion of C.O. Savage's declaration in which he states that he "did not know of any medical diagnoses [or] medical needs [p]laintiff may have had," and that he "did not deny [p]laintiff any call outs, including mental health call outs."  Dkt. No. 109-20 at 2, 3, ¶¶ 10, 14.  Defendants also cite the declarations of C.O. Bogardus and C.O. Kaiser, who similarly state that they never denied plaintiff mental health, or any other, callouts and they were unaware of any medical diagnosis or medical needs that plaintiff had.  See Dkt. No. 109-15 at 2 ¶¶ 8, 13; Dkt. No. 109-16 at 2 ¶¶ 8, 13.  In addition, C.O.s Bogardus and Kaiser both declare that they "have no recollection" of any incident in which they witnessed plaintiff cut himself.  Dkt. No. 109-15 at 2 ¶ 14; Dkt. No. 109-16 at 3 ¶ 14.  Thus, defendants contend, "there is no admissible evidence to

substantiate [plaintiff's] allegations" that C.O. Bogardus and Kaiser observed plaintiff

harm himself and failed to provide aid.  Dkt. No. 109-26 at 14.

### ii. OMH Defendants

First, defendants contend that, insofar as plaintiff contends that the OMH

defendants failed to provide him with adequate mental health treatment by denying him

placement in either ICP or TrICP, plaintiff's claim lacks merit.  See Dkt. No. 109-26 at

15.  Defendants proffer Dr. McCloskey's declaration, in which he explains that, over the

course of his nine visits with plaintiff between June 2015, and August 2016, he provided

plaintiff with supportive counseling, listened to plaintiff and evaluated plaintiff's mental

state, and referred him to the medical department where appropriate, and "made

decisions as to the appropriate course of treatment using [his] professional judgment."

Dkt. No. 109-10 at 7 ¶ 39.  Dr. McCloskey indicates that plaintiff's "primary diagnosis

[was] of antisocial personality disorder," and explained that "[p]laintiff did not, during the

time [he] provided him with therapy, exhibit any symptoms that would have lead [him] to

believe that he was suffering from a major mental illness."  Id. at 3 ¶¶ 9, 11.  Moreover,

defendants submit N.P. Meyers' declaration in which she explains that she "would see

[plaintiff] once every three months, or as needed" and "would evaluate his mental health

status[] and assess his need for medication," which she states "is the basic standard of

care to be provided to mental health patients without a major mental illness."  Dkt. No.

109-18 at 2 ¶¶ 10, 11.

Further, in his declaration, Dr. McCloskey explains that placement in the TrICP or

ICP was not appropriate for plaintiff because those programs "are for inmate patients

with more severe mental health treatment needs than those displayed by [p]laintiff or for inmate patients that require more assistance to adjust to the environment of prison general population than [p]laintiff required." Dkt. No. 109-10 at 6 ¶ 34. Dr. McCloskey further declares that,

> Based on [his] conversations with [p]laintiff, [his] review of the relevant medical notes and [his] experience and training as a licensed psychologist, [his] clinical opinion that placement of [p]laintiff in ICP or TrICP was not appropriate because his mental health symptoms did not required the level of more intensive treatment and, therefore, [he] did not recommend that [p]laintiff be placed in th[o]se programs.

Id. at ¶ 35. Defendants also cite N.P. Meyer's declaration in which she states that, although her treatment notes do not indicate that plaintiff asked her to place him in either the ICP or TrICP, "both . . . programs are for inmate patients with more serious mental health treatment needs and for inmate patients that require more assistance adjusting to the environment of prison general population that [p]laintiff required." Dkt. No. 109-18 at 5 ¶ 21. Therefore, N.P. Meyers states, she "would not have made a recommendation for [p]laintiff to be placed in either the ICP or TrICP" because placement in those programs "would be inappropriate for [p]laintiff given his mental health condition and history." Id. at ¶ 22. Moreover, both Dr. McCloskey and N.P. Meyers explain that neither of them had the authority to place plaintiff in TrICP or ICP. See Dkt. No. 109-10 at 6 ¶ 36; Dkt. No. 109-18 at 5 ¶ 23. In addition, defendants proffer the declarations of Bernstein, McCulloch, and Steed who reviewed plaintiff's grievances concerning his desire to be placed in TrICP or ICP and concluded that "the mental health treatment being provided by OMH was clinically appropriate and in accordance with the relevant policy." Dkt. No. 109-11 6 ¶ 23; Dkt. No. 109-17 at 4 ¶ 19;

Dkt. No. 109-12 at 4 ¶ 19.  Thus, defendants posit, the record establishes that plaintiff received appropriate mental health treatment and the fact that the OMH defendants declined to place him in TrICP or ICP does not evidence indifference to a serious medical need, as plaintiff's mental health did not require such treatment.  See Dkt. No. 109-26 at 31.  In this regard, defendants also aver that, because the record evidence establishes that plaintiff received appropriate and adequate mental health care, plaintiff cannot establish that the OMH defendants knew of but disregarded a serious risk to plaintiff's health and safety.  See id.

Defendants also contend that, to the extent that plaintiff alleges that the OMH defendants failed to refer plaintiff to the Great Meadow C.F. medical department, plaintiff's claim is belied by the record evidence.  See Dkt. No. 109-26 at 15.  In support of this contention, defendants point to Dr. McCloskey's, N.P. Meyer's, Steed's, McCulloch's, and Bernstein's declarations in which they explain that "[p]laintiff had the ability to request a medical call out and did not require a referral from OMH staff."  Dkt. No. 109-10 at 6 ¶ 38; Dkt. No. 109-18 at 5 ¶ 25; Dkt. No. 109-12 at 4 ¶ 18; Dkt. No. 109-17 at 4 ¶ 18; Dkt. No. 109-11 at 6 ¶ 22.  As a final matter, defendants reassert their contention that plaintiff has failed to establish Sullivan's personal involvement.  See Dkt. No. 109-26 at 32.

### e. Qualified Immunity

Citing Bryant v. Capra (No. 18-CV-10198 (KMK), 2020 WL 508843 (S.D.N.Y. Jan. 31, 2020)), defendants contend that Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, C.O. Kaiser, C.O. Bogardus, and Scroggy are entitled to qualified immunity

with respect to plaintiff's First Amendment Establishment Clause claim because, "insofar as the actions by [those d]efendants . . . can be viewed as seeking plaintiff's compliance with Directive 4919, such actions are permissible."  Dkt. No. 109-26 at 34 (citing Bryant, 2020 WL 508843, at *6).  Therefore, defendants argue, "[p]laintiff . . . cannot establish that [d]efendants' actions seeking to promote compliance with Directive 4914 violate [p]laintiff's clearly established rights."  Id.

## B. Plaintiff's Submissions in Response to Defendants' Motion (Dkt. Nos. 114 and 115)

### 1. Plaintiff's Responses in Opposition

Plaintiff's submission at Dkt. No. 114, liberally construed, may be read, in part, as opposing defendants' motion for summary judgment as to the OMH defendants.  In particular, plaintiff argues that there are "genuine facts in dispute" with respect to, as relevant here, whether "the OMH [d]efendants [were] legally bound to ensure [he] received suitable out of cell treatment and programming for" given his Mental Health Services Level of 2S; plaintiff was eligible for TrICP or ICP or other housing in therapeutic housing.  Dkt. No. 114 at 3 ¶¶ 1, 2, 3, 5, 6.[9]

At Dkt. No. 115, plaintiff contends that "[d]efendants are not entitled to [s]ummary [j]udgment because the claims in [his] complaint consist of genuine issues of material facts."  Dkt. No. 115-1 at 7.  Plaintiff states that the hair covering C.O. Savage referenced was  "atasalot-kob (crown)" and, therefore, "his order entailed that [plaintiff] had to register as a member of the Rastafarian faith in order to obtain said crown."  Id.

---

[9]  As stated above, the remainder of plaintiff's submission at Dkt. No. 114 is a request pursuant to Fed. R. Civ. P. 56(d) to stay resolution of defendants' motion and reopen discovery.

at 8.  Plaintiff asserts that he was an atheist, that "refraining from religion and religious practices were central aspects to [his] belief," and that he "personally decided to grow and wear" his long dreadlocks "free of religious influences."  Id.  In support of his argument in this regard, plaintiff proffers 23 affidavits submitted by other inmates from Great Meadow C.F. who were either housed or worked in plaintiff's unit, A-Block.  See Dkt. No. 115-3 at 2-20, 22-26.  Moreover, plaintiff, states "that there is nothing in DOCCS Directives [4919 and 4202] that required [him] to cover [his] dreadlocks with a crown, nor anything to support [DOCCS defendants] requiring [him] to change [his] religion to . . . Rastafarian . . . in order to wear a crown."  Id. at 9.

Plaintiff cites Amaker v. Goord (No. 06-CV-490A (HKS), 2010 WL 2595286 (W.D.N.Y. Mar. 25, 2010), report and recommendation adopted, No. 06-CV-490 (RJA), 2010 WL 2572972 (W.D.N.Y. June 23, 2010)), for the proposition that DOCCS modified Directive 4914, "which thereafter reflected that all inmates were allowed to grow their hair to any length desired, all inmates could grow and wear dreadlocks without fear of punishment, and they didn't have to be a registered member of the Rastafarian faith, and the prison population was happily ever after."  Dkt. No. 115-1 at 11.  Plaintiff also posits that the revised version of Directive 4202 allows "all inmates [to] wear any religious head covering and possess any religious item and they didn't have to be a member of any specific religion[.]"  Id. at 12.  Plaintiff contends, therefore, that "[w]hen [DOCCS d]efendants requir[ed him], as an atheist, to wear a tsalot-kob they . . . impos[ed] a substantial burden on [his] ability to remain free of religion and religious practices[,]" as "Rastafarians wear their crowns for religious purposes," which he "disagree[s] with as an atheist."  Id. at 11-12.

Concerning the exhaustion of administrative remedies with respect to his First Amendment retaliation claim insofar as asserted against C.O. Bogardus and C.O. Kaiser, plaintiff states that, C.O. Bogardus and C.O. Kaiser denied him meals in retaliation for filing his grievance, but that he did not learn these officers' names until "later." Dkt. No. 115-1 at 14. He states that he referred to C.O. Bogardus and C.O. Kaiser as "Officers" in his second grievance because he "didn't know them by their names." Id. Plaintiff reasserts his allegations that C.O. Savage, C.O. Bogardus, and C.O. Kaiser denied him meals in retaliation for filing grievances. See id. at 15.

Further, plaintiff avers that genuine issues of fact exist with respect to his Eighth Amendment conditions of confinement claim against C.O. Savage, C.O. Bogardus, and C.O. Kaiser. See Dkt. No. 115-1 at 15. Plaintiff contends that C.O. Bogardus and C.O. Kaiser were aware that C.O. Savage confined plaintiff to his cell on the condition that plaintiff could not come out "with [his] dreadlocks wrapped on the top of [his] head unless it was covered with a religious hair covering" and that plaintiff was not leaving his cell to go to the mess hall. Id. at 16. Plaintiff reasserts that his confinement and deprivation of nutritious meals resulted in "substantial . . . weight loss, stomach pains, headaches, dizzy spells, rashes, lack of energy and motivation, and depression." Id. Plaintiff posits that C.O. Bogardus and C.O. Kaiser were also aware of plaintiff's confinement, because they observed plaintiff "not coming out [of his] cell" and, as evidenced by C.O. Bogardus' statement, "[w]hen he's hungry enough, he'll come out of his cell the way we told him." Id.

Moreover, plaintiff opposes defendants' motion to dismiss his Eighth Amendment medical indifference claim insofar as asserted against C.O. Savage, C.O. Bogardus,

and C.O. Kaiser.  See Dkt. No. 115-1 at 17-19.  Plaintiff states that, given his status of a MHSL 2S, he was "entitled to out of cell programming and treatment[,]" and that this designation alerted C.O. Savage, C.O. Bogardus, and C.O. Kaiser that he suffered from "'S' or 'Serious'" conditions based on his diagnoses of antisocial personality disorder and intermittent explosive disorder.  Id. at 17.  Plaintiff avers that C.O. Savage, C.O. Bogardus, and C.O. Kaiser refused plaintiff his mental health treatment "by not putting [him] down for [his] scheduled appointments" and not allowing him to "leave [his] cell on [his] own."  Id. at 18.  He also states that, "[w]hen ever [sic] it was alleged after July 14, 2015 . . . that [he] was not going to [his] call outs, it was because these defendants deliberately did not make note of [his] request."  Id.  In support of this contention, plaintiff cites his own grievances and OMH complaints.  See id.  Plaintiff reasserts his allegation that C.O. Bogardus and C.O. Kaiser failed to obtain treatment for plaintiff after he cut himself in front of them.  See id. at 19.

        In addition, plaintiff argues that DOCCS defendants are not entitled to qualified immunity, "because in 2015, DOCCS Directives[] 4914 & 4202 had clearly established that [he] could grow [his] dreadlocks to any length desired and did not have to cut them as [d]efendants were requiring" and "it was clearly established that he did not have to wear a tsalot-kob on [his] dreadlocks in order to wear them above shoulder length (wrapped up), and that [he] did not have to change [his] religion to . . . Rastafarian . . . in order to wear a crown."  Dkt. No. 115-1 at 20.  He also asserts that "[i]t was clearly established at the time of [his] confinement no inmate/patient with a MHSL . . . 2/s can be confined to their cell for more than 30 days without out of cell treatment and programming."  Id.

### 2. Plaintiff's Rule 56(d) Request to Reopen Discovery (Dkt. No. 114)

Plaintiff states that his "motion . . . is actually a supported affidavit made . . . to set aside defendant's [sic] summary judgment motion." Dkt. No. 114 at 2. Although plaintiff labels his motion as being made pursuant to Fed. R. Civ. P. 56(f), which he states was "formerly known as Rule 56(d)," id. 114 at 2, it appears that plaintiff has merely reversed the sequence of the 2010 Amendment, pursuant to which "Subdivision (d) carrie[d] forward without substantial change the provisions of former subdivision (f)." FED. R. CIV. P. 56, Advisory Committee Notes to 2010 Amendment of Subsection (d). Indeed, plaintiff requests that the Court "set aside [d]efendants [sic] Summary Judgment Motion that pertains to OMH [d]efendants," because he is "ill prepared to defendant against them due in part, to the complex issues, the multi-faceted entities that [he is] against," including "OMH, CNYPC, DOCCS, GMCF's MHU, and GMCF," which he states "each [has its] own Rules & Regulations, and Policies and Procedures)," and because plaintiff is "a layman to the law and this field of study." Id. at 14 ¶ 49. In particular, plaintiff argues that the Court's dismissal of Corey Jackson as a defendant in this action was premature because "documents would later show that he was more personally involved than previously thought[.]" Id. at 3 ¶ 7. Plaintiff also states that he requested, but was denied, "a complete copy of [his] OMH records," id. at 3 ¶ 4, which he posits is necessary for him to determine whether defendants afforded him adequate mental health treatment. See id. at 5 ¶ 14.

### C. Defendants' Reply to Plaintiff's Opposition and Opposition to Plaintiff's "Cross Motion"

Defendants reassert that it was plaintiff's unwillingness to comply with DOCCS hairstyling and grooming directives, and not C.O. Savage's purported coercion to register as a Rastafarian, that caused plaintiff to stay inside his cell.  See Dkt. No. 118 at 4.  Defendants note that plaintiff relies solely on his own grievances, OMH complaints, and statements, in opposition to defendants' motion as to his Establishment Clause claim, which defendants aver fails to raise a genuine issue of fact.  See id. Moreover, defendants argue that plaintiff's reading of Directive 4914 is mistaken, as "[t]he plaint language of [Directive 4914] makes clear that [p]laintiff's preferred hair style was not permitted."  Id. at 5.  Further, defendants contend that plaintiff's arguments concerning Directive 4202 are erroneous, as that directive makes clear that "tsalot-kobs are 'only authorized for members of the Rastafarian faith.'"  Id. at 5-6 (quoting DOCCS Directive 4202, reproduced at Dkt. No. 115-3 at 38).

Defendants further argue that plaintiff has failed to raise a genuine issue of fact concerning his First Amendment retaliation claim.  See Dkt. No. 118 at 6.  Defendants argue that plaintiff has failed to establish that C.O. Savage took any adverse action against him, as plaintiff acknowledged at deposition that he could have left his cell at any time if he complied with DOCCS hairstyle and grooming directives.  See id. Further, defendants contend that plaintiff cannot establish a First Amendment retaliation claim against C.O. Bogardus and C.O. Kaiser because he has not demonstrated that he engaged in any protected conduct against them.  See id. at 7.  In particular, defendants posit that plaintiff did not file any grievances against C.O. Bogardus and C.O. Kaiser, and neither of those defendants recalled plaintiff filing a grievance against them and

deny having been directed to retaliate against plaintiff.  See id. at 7-8; Dkt. No. 109-15 at 2 ¶ 15, 3 ¶¶ 16, 17; Dkt. No. 109-16 at 2 ¶¶ 15, 16, 3 ¶ 17.

Concerning plaintiff's Eighth Amendment conditions of confinement claim against C.O. Savage, C.O. Bogardus, and C.O. Kaiser, defendants argue that plaintiff has failed to raise a genuine issue of material fact.  See Dkt. No. 115-1 at 8.  In particular, defendants posit that "[p]laintiff's submission fails to controvert the key fact conceded in his deposition that he was free to leave his cell if he styled his hair in a manner that complied with DOCCS directives."  Id.  Defendants contend that plaintiff's refusal to comply with applicable prison rules and self-imposed confinement—not the actions of C.O. Savage, C.O. Bogardus, and C.O. Kaiser—caused plaintiff to miss out on meals.  See id.  Therefore, defendants argue, plaintiff fails to establish the objective element for an Eighth Amendment claim of unconstitutional conditions of confinement.  See id. Moreover, defendants submit that plaintiff has failed to establish the subjective element for an Eighth Amendment claim, as he has not proffered admissible evidence that C.O Savage, C.O. Bogardus, and C.O. Kaiser were aware that he was suffering a medical condition or that he was refusing to leave his cell.  See id.  Rather, defendants state, plaintiff has offered only conclusory allegations that defendants knew of but disregarded an excessive risk to his health or safety.  See id. at 8-9.  Based on the foregoing, defendants contend that plaintiff has also failed to establish a claim of Eighth Amendment medical indifference against C.O. Savage, C.O. Bogardus, and C.O. Kaiser.  See id. at 9.  Defendants point out that, even assuming C.O. Savage, C.O. Bogardus, and C.O. Kaiser failed to obtain medical treatment for plaintiff, his claim must fail because the evidence in the summary judgment record establishes that plaintiff was

able to seek out and obtain medical treatment on his own and did not need DOCCS staff to refer him to the medical department.  See id.  Moreover, defendants reassert that plaintiff failed to exhaust administrative remedies with respect to his claims against C.O. Bogardus and C.O. Kaiser, and posit that plaintiff's "generalized statement that 'officers' did not provide him with meals" is insufficient to satisfy the exhaustion requirement.  Dkt. No. 118 at 12.

Defendants also oppose plaintiff's argument, asserted in Dkt. No. 114, that defendants' motion for summary judgment should be dismissed because he was not provided with his full mental health record.  See Dkt. No. 118 at 9.  Defendants point out that the Court previously denied plaintiff's request for his entire mental health file in ruling on his first motion to compel.  See id. (citing Dkt. No. 75-1 at 14-15).  Further, defendants observe that discovery in this action closed on June 26, 2020, and contend that plaintiff has not proffered any proof in support of his assertion that the portions of his medical record that he received were "saturated with inconsistencies[.]"  Id. (quoting Dkt. No. 114 at 5 ¶ 9).  Moreover, defendants aver that plaintiff has failed to proffer any evidence to establish that a genuine issue of material fact exists with respect to the issue of the adequacy of the mental health treatment provided by the OMH defendants.  See id. at 10.  In addition, defendants aver that plaintiff's arguments regarding the lack of referrals to ICP and TrICP are refuted by admissible evidence and amount only to a non-actionable disagreement concerning his course of medical treatment.  See id.

Defendants reassert their argument that Supt. Miller, C.O. Savage, C.O. Kaiser, C.O. Bogardus, Sgt. Coonradt, Sgt. Hawk, and Scroggy are entitled to qualified immunity.  See Dkt. No. 118 at 11.  Defendants aver that, insofar as plaintiff argues in

opposition that DOCCS directives permitted him to wear his dreadlocks wrapped on top of his head, his assertions are "conclusory" and "controverted by the clear and plain language of Directive 4919." Id.  Similarly, defendants aver that plaintiff's own submission in support of his opposition, namely DOCCS Directive 4202, belies his assertion that he was not required to be a Rastafarian in order to wear a tsalot-kob. See id. (citing Dkt. No. 115-3 at 37-38).  Moreover, defendants state that, plaintiff's assertion regarding Directive 4202, raised for the first time in opposition, runs "counter to [his] position . . . which challenged [d]efendants' restrictions on his ability to wear his dreadlocked hair wrapped or pinned atop his head without a religious covering." Id. (emphasis omitted).

### D. Plaintiff's Reply

Purportedly in reply to defendants' opposition to plaintiff's submission at Dkt. No. 115, plaintiff asserts his contention that Directive 4914 provides him with a "constitutionally protected interest in growing, keeping clean, and protecting [his] dreadlocks." Dkt. No. 119 at 2.  Plaintiff avers that Directive 4914 does not govern "how to accommodate inmates who ha[ve] dreadlocks as long as [his,]" and that defendants' interpretation of Directive 4914 is erroneous and based on an outdated "2008 policy found in Directive 4202." Id.  Plaintiff contends that the numerous inmate affidavits submitted with his opposition to defendants' motion establish that C.O. Savage issued plaintiff a direct order to remain in his cell unless he covered his dreadlocks with a religious covering, which he posits establishes that he was confined to his cell and coerced to register as a Rastafarian. See id. at 5-6.  Moreover, plaintiff reasserts his

arguments with respect to exhaustion of administrative remedies and qualified immunity.  See id. at 6-7.  Finally, plaintiff reasserts, in summary fashion, his Eighth Amendment medical indifference claims against the OMH defendants.  See id. at 7-8.

### III. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The moving party has the burden of showing the absence of a genuine dispute of material fact by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion.  Celotex, 477 U.S. at 322; see FED. R. CIV. P. 56(c).  A fact is material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial."  Id. at 248, 250; see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d

Cir. 2003).  Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp. (Motors Holding Div.), 758 F.2d 839, 840 (2d Cir. 1985) (per curium)).  Furthermore, "mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (brackets omitted) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).  Indeed, Fed. R. Civ. P. 56(e) explicitly states that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest.  At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v.
Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to
count, we have reminded district courts that when [a] plaintiff proceeds pro se, . . . a
court is obligated to construe his pleadings liberally." (internal quotation marks and
citations omitted)).


### IV. Analysis[10]

### A.  Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any
administrative remedies available to him or her before bringing an action for claims
arising out of his or her incarceration.  See 42 U.S.C. § 1997e(a) ("No action shall be
brought with respect to prison conditions under section 1983 . . . by a prisoner confined
in any jail, prison, or other correctional facility until such administrative remedies as are
available are exhausted.").  The exhaustion requirement applies "'to all inmate suits
about prison life, whether they involve general circumstances or particular episodes,
and whether they allege excessive force or some other wrong.'"  Cucchiara v. Dumont,
No. 9:18-CV-0182 (GLS/CFH), 2019 WL 2516605, at *4 (N.D.N.Y. Apr. 26, 2019)
(quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)).  Further, the exhaustion
requirement applies even where the prisoner seeks relief not available in the
administrative grievance process, such as money damages.  See Porter, 534 U.S. at
524.  "To exhaust administrative remedies, the inmate must complete the full

---

[10]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted,
have been provided to plaintiff.

administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated."  Cuadrado v. Brueault, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at *3 (N.D.N.Y. Apr. 8, 2015); see Jones v. Bock, 549 U.S. 199, 218 (2007).

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply."  Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (internal quotation marks and citation omitted).  Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004).  Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances."  Id.  However, in Ross v. Blake, the Supreme Court held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement."  Ross v. Blake, ____ U.S. ____ 136 S. Ct. 1850, 1862 (2016).  Thus, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the PLRA.  See Williams v. Correction Officer Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

However, courts must still consider the PLRA's "textual exception to mandatory exhaustion."  Ross, ____ U.S. ____, 136 S. Ct. at 1858.  Under this exception, courts must determine whether administrative remedies were "available" to a prisoner.  Id.  The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple

dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

There is no genuine dispute that, at all relevant times, DOCCS had in place a well-established three-step administrative procedure for inmate grievances known as the IGP. See N.Y. Comp. Codes R. & Regs. (7 N.Y.C.R.R.) § 701.5. First, the inmate must file a complaint with an IGP clerk within 21 calendar days of the alleged incident. See 7 N.Y.C.R.R. § 701.5(a)(1). An IGP representative has 16 calendar days to informally resolve the issue. See id. at § 701.5(b)(1). If no informal resolution occurs, the Inmate Grievance Review Committee ("IGRC") must hold a hearing within 16 calendar days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. See id. at § 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. See id. at § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to CORC within seven calendar days after receipt of the superintendent's determination. See id. at § 701.5(d)(1)(i). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the

superintendent, and any direct parties within thirty 30 calendar days from the time the appeal was received."  Id. at § 701.5(d)(3)(ii).

"Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of [all administrative remedies] may a prisoner seek relief pursuant to section 1983 in a federal court."  Murray v. Goord, 668 F. Supp. 2d 344, 355-56 (N.D.N.Y. 2009).  On a motion for summary judgment, "[t]he defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action."  McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017), report and recommendation adopted, No. 9:16-CV-277 (MAD/DJS), 2018 WL 879270 (N.D.N.Y. Feb. 14, 2018).

### 1. Plaintiff Failed to Exhaust Available Administrative Remedies with Respect to His Claims Against C.O. Bogardus and C.O. Kaiser

"It is well-settled that a plaintiff does not have to name all the defendants in his grievance in order to exhaust his administrative remedies."  Wilson v. Cabrera, No. 9:19-CV-1294 (DNH/ATB), 2020 WL 4678293, at *5 (N.D.N.Y. July 15, 2020), report and recommendation adopted, No. 9:19-CV-1294 (DNH/ATB), 2020 WL 4673941 (N.D.N.Y. Aug. 12, 2020); see Jones v. Bock, 549 U.S. 199, 217, 219 (2007) (holding that "nothing in the [PLRA] imposes a 'name all defendants' requirement" and that "exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances.").  "The court looks to the grievance procedure promulgated by the state in question."  Wilson, 2020 WL 4678293, at *5.  Under the grievance procedure set forth under 7 N.Y.C.R.R. § 701 *et seq.*, "[a]ll that is necessary is that the

grievance contain a 'concise, specific description of the problem.'" Id. (quoting N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(a)(2)) (additional citations omitted).

Defendants aver that plaintiff's "generalized statement that 'officers' did not provide him with meals" is insufficient to satisfy the exhaustion requirement. Dkt. No. 118 at 12. Plaintiff counters that he did not know the names of the defendants whom he identified only as "officers" at the time he filed the grievance. Dkt. No. 115-1 at 14. Plaintiff filed Grievance No. GM-60782-16 on March 21, 2016. See Dkt. No. 109-14 at 22-23. In Grievance No. GM-60782-16, plaintiff stated that he filed his July 14, 2015 grievance in which he complained of C.O. Savage's purported order to stay inside his cell until unless he wrapped his hair in a religious hair covering. See id. Plaintiff alleged that, "[s]ince July 14, 2015 until present day (March 16, 2016), . . . [he] ha[d] been confined to [his] cell because of [C.O.] Savage [sic] direct order. At no time ha[d] [he] been provided meals by any of the officers; and on 9 or 10 different [occasions] was not allowed to go to commissary even thought he had money in [his] account and wasn't on loss of commissary." Id. at 23 (emphases added). Plaintiff also stated that he was "not being allowed to go to [his] M-H-U call outs." Id.

Sgt. Coonradt acknowledges that he "was assigned to investigate plaintiff's "grievance GM-60782-16 in March 2016." 109-14 at 2 ¶ 6. Sgt. Coonradt's report to the IGPS made no mention of either C.O. Bogardus or C.O. Kaiser, and did not discuss the denial of meals or mental health call outs; rather it discussed only whether plaintiff's requested hair style violated Directive 4914 and whether C.O. Savage was harassing him. See id. at 15. Similarly, C.O. Savage's report to the IGPS 26, the Acting Grievance Supervisor's report to the IGRC 28, and the IGPS denial of Grievance No.

GM-60782-16 addressed only plaintiff's request to wrap his hair atop his head.  See id. at 25, 26, 28.  Moreover, although the CORC's decision upholding the denial of Grievance No. GM-60782-16 stated that plaintiff "regularly ma[de] commissary purchases" and "advise[d] [plaintiff] to address mental health concerns to the [OMH]," it did not reference C.O. Bogardus or C.O. Kaiser, or their alleged acts of denying plaintiff meals or mental health callouts.  Id. at 19.  In addition, C.O. Bogardus and C.O. Kaiser both declare that they had no recollection of plaintiff filing a grievance against them. See Dkt. No. 109-15 at 2 ¶ 15; Dkt. No. 109-16 at 2 ¶ 15.

Although, as stated above, "exhaustion is not *per se* inadequate" because plaintiff did not name C.O. Bogardus and C.O. Kaiser in his March 21, 2016 grievance, plaintiff offered no description or identifying information about the correction officers who allegedly retaliated against him for filing his July 14, 2015 grievance, aside from stating that the individuals who did not provide him with meals were "officers."  Dkt. No. 109-14 at 23.  Plaintiff offered no description whatsoever of the person(s) who allegedly did not "allow[]" him to go to his mental health callouts.  Id.; cf. Varela v. Demmon, 491 F.2d 442, 449 (S.D.N.Y. 2007) (denying the defendants' motion for summary judgment insofar as they sought dismissal of plaintiff's Eighth Amendment claim for failure to exhaust based on the plaintiff's failure to include the defendants' names in his grievance, where the plaintiff identified the defendants as "the officers escorting me" and "an officer which was posted on building 2 gate.").  Indeed, C.O. Kaiser explained in his declaration that, "[d]uring 2015-2017, [he] mainly worked on the A-5 yard supervising inmates while they were in the yard and the A-2 paint gang supervising inmates while they painted" Dkt. No. 109-16 at 2 ¶¶ 5.  C.O. Bogardus also indicated

43

that, "[d]uring 2015-2017, [he] did not have a permanent job posting in A-Block were [p]laintiff was housed, but rather, [he] occasionally worked in A-Block and did chow runs, took counts, and took inmates to the yard." Dkt. No. 109-15 at 2 ¶ 5. Thus, the summary judgment record does not allow the undersigned to infer, that plaintiff's vague reference to "officers" in his March 21, 2016 grievance was intended to allege that two correction officers, who did not hold permanent positions on plaintiff's housing block, denied him meals and mental health callouts over the alleged "8 months" he was "confined to [his] cell because of [C.O.] Savage['s] . . . order." Dkt. No. 109-14 at 23.

Moreover, although plaintiff asserts that "the grievance supervisor refused to investigate and address th[e] portions of [his] grievance [concerning] not being provided food, being denied MHU callouts, and denied commissary[,]" Dkt. No. 119 at 6, those assertions all hinge on plaintiff's self-imposed confinement to his cell, which was investigated and addressed. See Dkt. No. 109-14 at 19, 24, 25, 26, 28. Therefore, it is recommended that plaintiff's claims against C.O. Bogardus and C.O. Kaiser be dismissed for failure to exhaust available administrative remedies. Alternatively, as discussed below, it is recommended that plaintiff's claims against C.O. Bogardus and C.O. Kaiser be dismissed as meritless.

### B. Personal Involvement—Sullivan, Supt. Miller, and Sgt. Coonradt

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section 1983 cause of action

against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Courts in this circuit routinely hold that "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." Kinch v. Artuz, No. 97-CV-2419 (LAP), 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir. 1995) and Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Colon, 58 F.3d at 874 (holding that the fact that the defendant occupied a high-ranking position in the New York prison hierarchy, without more, was insufficient to establish personal involvement). Prior to deciding Ashcroft v. Iqbal, 556 U.S. 62 (2009), the Second Circuit held that supervisory personnel could be considered "personally involved" if

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the
> rights of inmates by failing to act on information indicating
> that unconstitutional acts were occurring.

Colon, 58 F.3d at 873 (citing Wright, 21 F.3d at 501 (additional citation omitted)).

In Tangreti v. Bachmann, 983 F.3d 609 (2d Cir. 2020), the Second Circuit

addressed how the Supreme Court's decision in Iqbal affected the standards in Colon

for establishing supervisory liability.  Consistent with other circuits, the Second Circuit

concluded that "there is no special rule for supervisory liability," and held that a "plaintiff

must plead and prove 'that each Government-official defendant, through the official's

own individual actions, had violated the Constitution.'"  Id. at 618.[11]  The Second Circuit

explained that, "'the factors necessary to establish a [§ 1983] violation will vary with the

constitutional provision at issue' because the elements of different constitutional

violations vary.  The violation must be established against the supervisory official

directly."  Id. (quoting Iqbal, 556 U.S. at 676).  "District courts discussing *Tangreti* agree

that the decision invalidated the *Colon* test and mandates that a plaintiff must establish

a violation against the supervisory official directly."  Fabrizio v. Smith, No. 9:20-CV-0011

(GTS/ML), 2021 WL 2211206, at *10 (N.D.N.Y. Mar. 10, 2021) (collecting cases), report

---

[11]  Prior to Tangreti, Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement.  Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011) (recognizing that several District Courts in the Second Circuit have debated Iqbal's impact on the five Colon factors), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 185 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

and recommendation adopted, No. 9:20-CV-0011 (GTS/ML), 2021 WL 2211023
(N.D.N.Y. June 1, 2021).

### 1. Sullivan

Defendants have proffered admissible evidence that Sullivan, "[a]s the
Commissioner of OMH," Sullivan "has no personal role in addressing or answering
complaints filed by OMH patients or inmate patients" and "did not review [p]laintiff's
OMH complaint, investigate the allegations made therein, or review the findings or
conclusions made by other OMH personnel regarding the said allegations."  Dkt. No.
109-22 at 2 ¶¶ 6, 7.  Thus, defendants' admissible documentary evidence establishes
that Sullivan did not, by her "own individual actions," violate plaintiff's Eighth
Amendment rights.  Tangreti, 983 F.3d at 616.

Indeed, even applying the now-invalid Colon standard, plaintiff cannot establish
Sullivan's personal involvement.  As Sullivan explained, "[any] letters of complaint that
are addressed to [her] are forwarded to OMH Risk Management for investigation and
reply" and that "[i]f a patient disagrees with Risk Managements [sic] findings and is
incarcerated and receiving OMH services through a DOCCS facility, the inmate patient
may appeal Risk Management's determination to the Executive Director of [CNYPC]."
Dkt. No. 109-22 at 2 ¶ 5.  Thus, at most, defendants' admissible evidence establishes
that Sullivan referred any complaint from plaintiff to OMH Risk Management—which is
insufficient to establish her personal involvement for purposes of Section 1983.  See
Jones v. Fischer, No. 9:11-CV-774 (GLS/CFH), 2013 WL 4039377, at *10 (N.D.N.Y.
Aug. 7, 2013) ("[R]eceipt of a letter . . ., without personally investigating or acting on [it],

is insufficient to establish personal involvement."); <u>Jean-Laurent v. Lane</u>, No. 9:11-CV-186 (NAM/TWD), 2013 WL 600213, at *16 (N.D.N.Y. Jan. 24, 2013) ("[M]ere receipt of a report or complaint or request for an investigation . . . is insufficient to hold the official liable for the alleged constitutional violations."), <u>report and recommendation adopted</u>, No. 9:11-CV-186 (NAM/TWD), 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013); <u>Walker v. Pataro</u>, No. 99-CV-4607(GBD/AJP), 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.").  Plaintiff's conclusory assertion in opposition that there are "genuine facts in dispute" insofar as it relates to Sullivan, Dkt. No. 114 at 3 (capitalization omitted), is insufficient to defeat defendants' documentary case.  <u>See</u> <u>Batista v. Union of Needleworkers</u>, No. 97-CV-4247 (HB), 2000 WL 1760923, at *3 (S.D.N.Y. Nov. 30, 2000) (holding that the plaintiff's "conclusory statements" offered "in response to [the] defendant's evidence" were "insufficient as a matter of law to raise an issue of fact."); <u>see also</u> <u>Scott v. Coughlin</u>, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case.").  Accordingly, it is recommended that plaintiff's Amended Complaint be dismissed insofar as asserted against Sullivan for lack of personal involvement.

**2. Supt. Miller**

As stated above, Tangreti makes it clear that, to establish a constitutional violation against a supervisor, the plaintiff "must plead and prove that [the supervisor-] defendant, through [his] own individual actions, has violated the constitution." Tangreti, 983 F.3d at 618 (internal quotation marks omitted). In light of Tangreti, plaintiff cannot establish Supt. Miller's personal involvement based upon the denial of a grievance and/or appeals, because it does not plausibly suggest "[t]he factors necessary to establish" a First Amendment Establishment Clause claim. Id. Further, even applying the now-invalid Colon standard, as defendants aver, Supt. Miller's review and affirmance of the IGRC's denials of plaintiff's grievances is insufficient to establish personal involvement. See Zielinski v. Annucci, No. 9:17-CV-1087 (GTS/CFH), 2019 WL 2479616, at *12 (N.D.N.Y. Jan. 8, 2019) ("[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement."), report and recommendation adopted, No. 9:17-CV-1087 (GTS/CFH), 2019 WL 1305826 (N.D.N.Y. Mar. 22, 2019). Similarly, plaintiff's contention that Supt. Miller did not respond to his letter requesting that C.O. Savages order be revoked, causing him to remain "wrongly confined to his cell," Amen. Compl. at 8 ¶ 41, fails to establish Supt. Miller's personal involvement in the alleged constitutional violations. See Rodriguez v. Rock, No. 9:13-CV-01106 (DNH), 2015 WL 5147045, at *6 (N.D.N.Y. Sept. 1, 2015) ("[I]t is well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find that the defendant was personally involved in the deprivation alleged."). Plaintiff did not advance any arguments or proffer any evidence in opposition to defendants' motion in this regard. See Dkt. No. 119 at 2-

9.  Accordingly, it is recommended that the Amended Complaint be dismissed as to Supt. Miller for lack of personal involvement.

### 3. Sgt. Coonradt

Plaintiff alleges only that Sgt. Coonradt "issued orders and/or ruled on plaintiff's grievances in a way that would force and/or encourage him to be a member of the Rastafarian religion so he could wear their religious hair covering in order to wrap his dredlocks [sic] up even after becoming aware that plaintiff [was] non-religious and didn't want to practice the tenets of any religion."  Amen. Compl. ¶ 114.  However, as the record evidence establishes that Sgt. Coonradt's involvement was limited to investigating plaintiff's grievances and issuing reports to the IGRC, see Dkt. No. 109-14 at 15, 27, plaintiff has failed to establish Sgt. Coonradt's personal involvement as to the alleged Establishment Clause violation.  See Gomez v. Sepiol, No. 11-CV-1017SR (MAT), 2014 WL 1575872, at *10 (W.D.N.Y. Apr. 11, 2014) ("[T]he investigation of a grievance alone, is not sufficient to allege personal involvement in the underlying constitutional violation."); see also Rosales v. Kikendall, 677 F. Supp. 2d 643, 649 (W.D.N.Y. 2010) (holding that the plaintiff failed to establish the defendant's personal involvement based on allegations that the defendant investigated the plaintiff's grievance and concluded that there was no evidence that the other defendants had retaliated against the plaintiff).  Plaintiff does not proffer any evidence in opposition to defendants' motion in this regard.  Accordingly, it is recommended that the Amended Complaint be dismissed as to Sgt. Coonradt for lack of personal involvement.

## C. Merits

### 1. First Amendment Claims

#### a. Retaliation

To establish a claim a First Amendment retaliation claim under Section 1983, a prisoner must demonstrate that "(1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action."  Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). Because of the potential for abuse and the "ease with which claims of retaliation may be fabricated," courts must examine prisoner retaliation claims with "skepticism and particular care."  Johnson v. Eggersdorf, 8 F. App'x 140, 144 (2d Cir. 2001) (summary order) (quoting Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)).

It is well established that the filing of a prisoner grievance constitutes protected conduct under the First Amendment.  See Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003) ("[T]he filing of prison grievances is a constitutionally protected activity."). Next, as to the second factor, adverse action, plaintiff alleges that C.O. Savage, C.O. Bogardus, and C.O. Kaiser "deprived [him] of . . . approximately 2,059 nutritiously prepared mess[ ]hall meals over a time span of 22 months, causing [plaintiff] to lose a substantial amount of [weight], (suffering) stomach pains, headaches, dizzy spells, lack of energy and motivation, breaking out with rashes and depression[.]"  Am. Compl. at 30 ¶ 118.  While the denial of meals may constitute adverse action, see Keesh v. Goord, No. 04-CV-271A (RJA), 2007 WL 2903682, at *10 (W.D.N.Y. Oct. 1, 2007) (holding that the plaintiff's confinement in keeplock for "nearly twenty-four hours," during which he

"may have been deprived of meals," constituted sufficient adverse action to support a First Amendment retaliation claim.), the record evidence here establishes that, to the extent plaintiff missed meals at the Green Meadow C.F. mess hall, it was due exclusively to his own personal choice, and not because of C.O. Savage's instruction.

Defendants point out that plaintiff testified at deposition that he would have been able to comply with DOCCS Directive 4914 if he had "tie[d] [his] dreads into a ponytail that still went to the back rather than pinned to the top of [his] head," then he "would . . . have been able to leave [his] cell." Dkt. No. 109-8 at 53. Defendants further point to plaintiff's deposition testimony in which he made clear that he was able to come out of his cell at any time with his hair down and that he came out of his cell for commissary because "there's no check points" and he "d[id]n't have to sit down"; at checkpoints and the mess hall, his hair would touch other people and the floor; and that, "[f]or the most part," "[t]he way [he] determined whether or not [he] came out of [his] cell would depend on whether or not [his] hair would come in contact with the other people or the floor." Dkt. No. 109-8 at 82; see id. at 81, 83. In particular, plaintiff explained that he did not want to stop at checkpoints because correction officers would check his hair "with the[] same security gloves . . . that they use in pat frisk" and to "check inmates [sic] boots . . ., that would all be on my hair." Id. at 82-83. He also stated that "these prisons is [sic] dirty, and so who knows what's on the floor that connects to my face where my hair is at . . . ." Id. at 83-84. Plaintiff explained that cutting his hair so that he could comply with inmate hairstyling and grooming policies "was not an option for [him]" and that he "wouldn't even entertain it." Id. at 36. In response to defense counsel's inquiry as to why plaintiff did not want to cut his hair, plaintiff testified, "[b]ecause I've been growing

[it] for . . . 20 something years, it's part of my identity, it's a part of my personality.  I didn't want to cut it."  Id. at 48.  Further, plaintiff acknowledged that, when C.O. Savage informed him that he could only wear his hair wrapped up if it was covered with a religious covering that he "kn[e]w at that point [that he] could also cut [his] hair."  Id. at 37.

Plaintiff's deposition testimony in this regard is corroborated by defendants' admissible evidence, including Sgt. Coonradt's grievance investigation report, which explained that plaintiff was "under no disciplinary sanction nor . . . confined in any way. He is free to attend meals, commissary, rec, and MHU as he wishes.  Any confinement has been self-imposed by [plaintiff]."  Dkt. No. 109-14 at 27.  Plaintiff's inmate declarations submitted in opposition to defendants' motion, to the extent admissible, fail to raise a genuine question of material fact as to whether plaintiff was confined to his cell based on C.O. Savage's instruction; rather, the inmate declarations establish only that C.O. Savage instructed plaintiff not to come out of his cell with his hair wrapped on top of his head in violation of Directive 4914—but not that plaintiff was confined to his cell such that he was prevented from obtaining meals.  See Dkt. No. 115-1 at 2, 4, 7, 8, 10.  Indeed, plaintiff chose not to go to the mess hall to receive meals because he did not want to stop at check points or sit down and have his hair touch other people or the floor.  See Dkt. No. 109-8 at 81-83.  Thus, the record evidence establishes that C.O. Savage did not retaliate against plaintiff by confining him to his cell and, therefore, plaintiff did not miss any meals because of C.O. Savage's instruction not to violate Directive 4914; rather, any missed meals or callouts were solely the result of his

decision to remain inside of his cell rather than comply with applicable inmate regulations.

Further, it is well settled that "[a]llegations of adverse actions alone . . . are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct." Baskerville v. Blott, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002).  Indeed, the plaintiff "bears the burden of showing . . . that the protected conduct was a substantial or motivating factor in the prison officials' decision to" take the alleged adverse action. Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (internal quotation marks and citation omitted).  Circumstantial factors indicating retaliatory motive include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) an inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.  See Baskerville, 224 F. Supp. 2d at 732 (citing Colon, 58 F.3d at 872-73).  With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."  Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty, 252 F.3d 545, 554 (2d Cir. 2001).

However, as the Second Circuit explained:

> [P]risoner retaliation claims are easily fabricated, and    . . .
> pose a substantial risk of unwarranted judicial intrusion into
> matters of general prison administration.  Accordingly, while
> we have held that temporal proximity between protected
> conduct and an adverse action constitutes circumstantial
> evidence of retaliation, we have consistently required some
> further evidence of retaliatory animus before permitting a
> prisoner to proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal citations and quotation marks omitted).

Here, plaintiff has asserted a close temporal proximity between his protected conduct and the alleged adverse action, as he suggests that the denial of meals began on July 15, 2015, one day after he filed his first grievance against C.O. Savage.  See Am. Compl. ¶¶ 33, 38, 74.  However, "temporal proximity alone is insufficient to establish an inference of retaliation," Thomas v. Waugh, No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at *4 (N.D.N.Y. Sept. 30, 2015), and the summary judgment record is devoid any other circumstantial evidence that supports an inference of retaliation.  For instance, plaintiff does not allege that C.O. Savage made any statements evidencing a retaliatory motive.  See See Baskerville, 224 F. Supp. 2d at 732; see also Arce v. Walker, 58 F. Supp. 2d 39, 46 (W.D.N.Y. 1999) (granting summary judgment in favor of the defendants and dismissing the pro se inmate plaintiff's First Amendment retaliation claim where, "[t]here w[a]s no evidence to support [the plaintiff's] bald conclusion that the actions at Attica were retaliatory" and the plaintiff "d[id] not allege that anyone made any statements to him or that he overhead any comments or observed any acts that suggested an improper motive.").  Indeed, plaintiff testified that, before July 14, 2015, he "knew who [C.O. Savage] was but . . . hadn't interacted" with him.  Dkt. No. 109-8 at 46.  Plaintiff explained that, after C.O. Savage told plaintiff that he could not wear his hair wrapped up on July 14, 2015, he told C.O. Savage he would write a grievance, in response, plaintiff testified that C.O. Savage stated, "go ahead, fine.  Write the grievance."  Id. at 45.  Plaintiff testified that he believed C.O. Savage "didn't care" that he was going to write a grievance.  Id.  Further,

aside from alleging that C.O. Savage told him that facility personnel "can't just let inmates do any old thing they want to do," plaintiff stated that he did not "have any further discussions with him about the situation." Id. at 68. Plaintiff also testified "[n]o" in response to defense counsel's question as to whether C.O. Savage "ma[d]e any further comments to [plaintiff] about . . . filing a grievance." Id. Moreover, plaintiff stated, "I don't know. I don't know," in response to defense counsel's inquiry as to why he believed C.O. Savage had "singled [him] out" about his hair. Id. at 84. In addition, plaintiff's submissions demonstrate that he has an extensive inmate disciplinary record dating back to 2005, see Dkt. No. 12-1 at 24-28, Dkt. No. 115-2 at 58-16, including at least five Tier II violations for having "unfastened hair." See Dkt. No. 12-1 at 24, 25.

In opposition, plaintiff submits the affidavits of 23 separate Great Meadow C.F. inmates. See Dkt. No. 115-3 at 2-28. As defendants contend, see Dkt. No. 118 at 4, many of these affidavits are of no evidentiary value, as they consist exclusively of hearsay and conjecture rather than the inmates' personal observations and/or do not identify C.O. Savage as the officer who allegedly ordered plaintiff not to leave his cell with his hair wrapped up without a religious covering. See, e.g., Dkt. No. 115-3 at 25 (Inmate Robert Brown's declaration, stating that plaintiff "informed [him] that hes [sic] been confined to his cell for approx. 22 months because of a direct order given to him about wearing a religious hair covering on his dreadlocks . . . when he wears [them] up, which he refuses to do."). Inmate Balfourd Ayala's declaration states that, "[o]n July 14, 2015 [he] witnessed officer Savage give [plaintiff] a [sic] order not to come out [sic] his cell with his hair wrapped up without a religious hair covering." Dkt. No. 115-3 at 7. Similarly, inmate Walter Washington's declaration states that On or about July 14, 2015,

. . . I observed officer Savage . . . ask [plaintiff] about a religious hair covering for his hair.  When [plaintiff] told him he didn't have one, officer Savage told [plaintiff] not to come out of his cell with his hair wrapped up without a religious hair covering on it."  Id. at 10.  Moreover, inmate Alexander Padilla declares that, "on July 14, 2015[, he] overheard [plaintiff] ask C.O. Savage where [he could] find according to DOC[CS] directives that [he was] not able to leave [his] cell without a religious hair covering for [his] locks," and that he "then heard C.O. Savage repl[y] its stated inside your rule book and I'm telling you to not leave your cell until you follow the directive."  Id. at 8.  At most, these inmate declarations establish that C.O. Savage instructed plaintiff not to leave his cell with his hair styled in a noncompliant manner.  Indeed, the inmate declarations corroborate defendants' admissible evidence, which demonstrates that plaintiff simply chose to remain inside of his cell most of the time and avoid the mess hall because he did not want to comply with Directive 4914 or go through security checkpoints.  See Dkt. No. 109-14 at 15, 27, 28; Dkt. No. 109-8 at 81-83.

With respect to C.O. Bogardus and C.O. Kaiser, plaintiff alleges only that those defendants "were aware that [he] wasn't coming out of his cell for chow . . . because these . . . defendant[s] . . . took the 'Go around' acknowledging him not coming out of his cell."  Amen. Comp. at 14 ¶ 64.  However, at deposition, plaintiff testified only that C.O. Bogardus and C.O. Kaiser "was just leaving [him] in" the cell even when he was "cutting" himself and "getting [him] no medical assistance," but did not mention any issues concerning those defendants and his ability to access food or the mess hall.  Dkt. No. 109-8 at 85.  Moreover, plaintiff's inmate declarations and grievance records are devoid of any reference to either C.O. Bogardus or C.O. Kaiser.  See Dkt. No. 109-14 at

15, 19, 25-28; Dkt. No. 115-3 at 2-28.  In addition, C.O. Bogardus and C.O. Kaiser both state in their sworn declarations that they did not prevent plaintiff from obtaining meals or retaliate against plaintiff in any way.  See Dkt. No. 109-16 at 2, 3 ¶¶ 12, 16, 17; Dkt. No. 109-15 at 2, 3 ¶¶ 12, 16, 17.  Thus, defendants have proffered admissible evidence establishing entitlement to summary judgment dismissing plaintiff's First Amendment retaliation claims, in opposition to which plaintiff has failed to raise a genuine issue of fact.  Accordingly, it is recommended that plaintiff's First Amendment retaliation claims against C.O.s Savage, Bogardus, and Kaiser be dismissed with prejudice.

### b. Establishment Clause

The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion."  U.S. CONST. amend. I.  It ensures that the government does not "coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion."  Muhammad v. City of New York Dep't of Corrs., 904 F. Supp. 161, 197 (S.D.N.Y. 1995) (internal quotation marks, brackets, and citation omitted).  "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."  Skoros v. City of New York, 437 F.3d 1, 39 (2d Cir. 2006) (internal quotation marks and citation omitted).  In Lemon v. Kurtzman, the United States Supreme Court set forth a test to assess whether a government practice satisfies the Establishment Clause.  See Lemon v. Kurtzman, 403 U.S. 602, 612-13, reh'g denied 404 U.S. 876 (1971).  "The Lemon test requires the Court to consider: (1) whether the government action in question has a secular purpose; (2) whether the primary effect of

the action, as seen by a reasonable observer, 'neither advances nor inhibits religion,' and (3) whether the action fosters 'excessive government entanglement with religion.'" Lewis v. Zon, 920 F. Supp. 2d 379, 386 (W.D.N.Y. 2013) (quoting Lemon, 403 U.S. at 612-13). However, "as with the Free Exercise Clause, prison officials are permitted to 'make [] difficult judgments concerning institutional operations,' as stricter scrutiny would 'seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.'" Powlette v. Morris, No. 13-CV-7378 (KPF), 2016 WL 3017396, at *8 (S.D.N.Y. May 23, 2016) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

Plaintiff alleges that defendants presented him with a "Hobson's Choice" between registering as a Rastafarian in order to be allowed to wear his hair wrapped up under a hair covering or remain inside his cell, such that defendants pressured him to register as a Rastafarian in violation of his First Amendment rights under the Establishment Clause. Amen. Compl. at ¶ 38. As discussed in detail above, see subsection IV.C.1.a., supra, plaintiff was, in fact, presented with no such predicament. Rather, the admissible evidence makes clear that, at most, C.O. Savage and Scroggy presented plaintiff with a potential solution—in response to his inquiry—for wearing his hair in his desired manner of wrapping it on top of his head without violating applicable DOCCS hairstyling regulations.

DOCCS Directive 4914, which was in effect at all relevant times, provides, in relevant part, that inmate's "[h]air may be permitted to grow over the ears to any length desired by the inmate. The hair must be neatly groomed and kept clean at all times." Dkt. No. 12-1 at 33. Concerning dreadlocks, Directive 4914 provides

> The dreadlock hairstyle is allowed.  When worn, dreadlocks must extend naturally from the scalp and may not be woven, twisted, or braided together forming pockets that cannot be effectively searched.  Inmates wearing <u>below</u> the shoulder length dreadlocks must tie them back in a ponytail with a barrette, rubber band, or other fastening device approved by the Superintendent.

Id.  However, Directive 4914 provides a single religious exemption from the general dreadlock rule, which states that, "[i]nmates of the Rastafarian religious faith may wear their dreadlocks in an approved religious head covering."  Id.

As plaintiff's Amended Complaint alleges, in June 2015, he entered the mess hall at Great Meadow C.F. "with his hair in a ponytail."  Amen. Compl. at ¶ 30.  However, plaintiff explained that, due to the length of his hair, his dreadlocks still touched the floor even when he sat down, so he "placed his hair around his waist and sat it in his lap to avoid it from coming into contact with the . . . floor."  Id.  C.O. Savage, while working in the mess hall on the unspecified date in June 2015, informed plaintiff that he could not sit with his hair touching the floor.  See id. at ¶ 31; see Dkt. No. 109-20 at 2 ¶ 6.  C.O. Savage explained that, "[p]laintiff asked if he needed to have a religious head covering in order to wear his hair atop his head."  Dkt. No. 109-20 at 2 ¶ 6.  C.O. Savage told plaintiff that "per DOCCS Directive 4914, he was required to wear a religious covering in order to wear his hair atop his head."  Id.  Similarly, Scroggy's declaration establishes that—in response to plaintiff's inquiry about wearing a hair covering—he "advised [p]laintinff that tying his hair to the top of his head was in violation of DOCCS policy" and "that, in order to comply with DOCCS policy, he had the option to request a waiver, on the basis of a religious accommodation granted to members of the Rastafarian faith, which would allow him to tie his hair to the top of his head, so long as it was covered

with an approved religious covering, or to cut his hair." Dkt. No. 109-21 at 2 ¶ 6.

Further, IGRC Acting Grievance Supervisor's April 2016 memorandum and Sgt.

Coonradt's October memorandum concluded only that C.O. Savage was correct that,

pursuant to Directive No. 4914, plaintiff was not allowed to wear his dreadlocks wrapped

on top of his head without a religious covering; plaintiff was not under any disciplinary

sanction as a result of his hair; and that any confinement to his cell was "self-imposed."

See Dkt. No. 109-14 at 27; see id. at 2 ¶ 10, 15 28.  Thus, the admissible evidence

establishes that C.O. Savage and Scroggy did not, as plaintiff claims, attempt to coerce

him to register as a Rastafarian; rather, defendants—in response to plaintiff's inquiries

regarding his proposed solutions to complying with DOCCS policies without cutting his

hair—merely informed plaintiff that he would need a religious exemption to allow him to

use a covering if he wished to wear his hair wrapped atop his head.  See Dkt. No. 12-1

at 33; Dkt. No. 109-20 at 2 ¶ 6; Dkt. No. 109-14 at 2 ¶ 10, 28.

Plaintiff's Establishment Clause claim against Sgt. Coonradt, Sgt. Hawk, and

Supt. Miller is even weaker, as those defendants did nothing more than determine that

plaintiff was not allowed to wear his hair wrapped up uncovered or wear a covering over

his dreadlocks without being a registered Rastafarian.  See Dkt. No. 109-14 at 5, 15;

Dkt. No. 109-13 at 6; Dkt. No. 109-19 at 2 ¶ 6.  Indeed, the summary judgment record is

devoid of any facts to establish that these defendants instructed or in any way

attempted to persuade or coerce plaintiff register as a Rastafarian; rather, the evidence

before the undersigned demonstrates that those defendants, at most, applied the plain

language of Direct 4914 to plaintiff's grievances and concluded that plaintiff was not

entitled to violate DOCCS rules based on his desired, but prohibited, hairstyle.  See id.

In opposition, plaintiff fails to establish the existence of a genuine issue of material fact.  First, as discussed above, plaintiff's inmate declarations establish only that C.O. Savage directed plaintiff not to exit his cell with his hair styled in a non-compliant manner.  See subsection IV.C.1.a, supra.  Moreover, plaintiff's assertion— raised for the first time in his opposition to defendants' motion—that, as an atheist, "refraining from religion and religious practices were central aspects to [his] belief," and that he "personally decided to grow and wear" his long dreadlocks "free of religious influences" is of no moment.  Dkt. No. 115-1 at 7.  As discussed above, neither defendants nor Directive 4914 prohibited plaintiff from wearing his hair down, even given the significant length of plaintiff's hair; rather, plaintiff was merely prohibited from styling his hair in a manner that violated applicable DOCCS policies.  See Dkt. No. 12-1 at 33.  In this respect, C.O. Savage's purported statement that "we can't just allow inmates to do what they want" is accurate, as neither he nor any of the other DOCCS defendants have the authority to allow plaintiff to violate prison rules.  Amen. Compl. at 9 ¶ 45.  In any event, plaintiff made clear during his deposition that his refusal to cut his hair was "because [he has] been growing [it] for . . . 20 something years, it's part of [his] identity, it's a part of [his personality.  [He] didn't want to cut it."  Dkt. No. 109-8 at 48.

In addition, plaintiff's contention that, following Amaker, DOCCS modified Directive 4914, such that "all inmates were allowed to grow their hair to any length desired, all inmates could grow and wear dreadlocks without fear of punishment, and they didn't have to be a registered member of the Rastafarian faith, and the prison population was happily ever after" is demonstrably false.  Dkt. No. 115-1 at 11.  Contrary to plaintiff's self-serving characterization of the legal issue presented in that

case, Amaker, in fact, assessed whether DOCCS could enforce a "policy of refusing to permit individuals who have designated their religion as anything other than Rastafarian to wear dreadlocks."  Amaker, 2010 WL 2595286, at *1.  Of course, it is undisputed that Directive 4914 allows non-Rastafarians to wear dreadlocks, which plaintiff does.  See Dkt. No. 12-1 at 33.  Moreover, as previously discussed, contrary to plaintiff's unsupported assertion in opposition, defendants did not "require[ plainitff], as an atheist, to wear a tsalot-kob," but merely informed him that the only way to wear such a covering was to register as a Rastafarian.  Dkt. No. 115-1 at 11; see Dkt. No. 12-1 at 33; Dkt. No. 109-20 at 2 ¶ 6; Dkt. No. 109-14 at 2 ¶ 10, 28.  Finally, as his own submissions demonstrate, plaintiff's unsupported assertion that DOCCS Directive 4202 allows all inmates to possess and wear a tsalot-kob is belied by the plaint language of that directive, which clearly states that a tsalot-kob "is approved religious headwear for members of the Rastafarian faith."  Dkt. No. 115-3 at 37.

In short, the undersigned concludes that instructing plaintiff—in response to his inquiries and requests—that his proposed hairstyle was not permissible under relevant DOCCS grooming and hairstyling policies, and informing him that he could wear a hair covering only if he registered as a Rastafarian—does not violate the Establishment Clause.  Accordingly, it is recommended that plaintiff's First Amendment Establishment Clause claim be dismissed with prejudice, as without merit.  In light of the foregoing, the undersigned declines to reach defendants' qualified immunity argument.

### 2. Eighth Amendment Claims

### a. C.O.s Savage, Bogardus, and Kaiser

Plaintiff alleges that C.O.s Savage, Bogardus, and Kaiser violated his Eighth Amendment rights in two ways.  First, he alleges that, by confining him to his cell and denying him the ability to go to eat meals in the mess hall, those defendants "deprived [him] of . . . approximately 2,059 nutritiously prepared mess[]hall meals over a time span of 22 months, causing [plaintiff] to lose a substantial amount of [weight], (suffering) stomach pains, headaches, dizzy spells, lack of energy and motivation, breaking out with rashes . . . ."  Am. Compl. at 30 ¶ 118; see Dkt. No. 115-1 at 16.  Second, plaintiff claims that C.O.s Savage, Bogardus, and Kaiser confined plaintiff to his cell and denied him the ability to attend mental health callouts and failed to obtain medical assistance when he cut himself, thereby denying plaintiff adequate medical care.  See id. at 21 ¶¶ 81, 82.  "The relevant legal standard governing both claims is the same."  Evans v. Albany Cty. Corr. Facility, No. 9:05-CV-1400 (GTS/DEP), 2009 WL 1401645, at *9, (N.D.N.Y. May 14, 2009).

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. CONST. amend. VIII.  "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted).  Thus, "a prisoner may prevail only where he proves both an objective element—that the prison officials' transgression was sufficiently serious—and a subjective element—that the officials acted, or omitted to act, with a sufficiently

culpable state of mind . . . ." Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

### i. Conditions of Confinement

To prevail on an Eighth Amendment claim for unconstitutional conditions of confinement, a plaintiff must prove that "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and alteration omitted). The objective prong can be satisfied where the plaintiff pleads "conditions [that] either alone or in combination, pose an unreasonable risk of serious damage to [the inmate's] health." Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)). There is no "static test" to determine whether or not an alleged deprivation is sufficiently serious to satisfy the objective prong. Id. (internal quotation marks omitted). Rather, courts must determine whether the conditions violate "contemporary standards of decency." Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995) (additional citation omitted)). To satisfy the subjective test, the inmate must show that "the defendant official acted with a sufficiently culpable state of mind . . . such as deliberate indifference to [the inmate's] health or safety." Id. (internal quotation marks and citation omitted). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while

65

actually aware of a substantial risk that serious inmate harm will result." Salahuddin v. Goord, 467 F.3d 253, 280 (2d Cir. 2006) (citation omitted).

"While no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (citations omitted). "To establish a valid claim that the denial of food . . . constitutes an Eighth Amendment violation, one must establish that there was a 'sufficiently serious condition' that resulted from the food not being received." Evans, 2009 WL 1401645, at *9. A condition is serious for constitutional purposes if it presents "a condition of urgency that may result in degeneration or extreme pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citations omitted).

Here, plaintiff alleges that C.O.s Savage, Bogardus, and Kaiser violated his Eighth Amendment rights by "deprivp[ing] [him] of . . . approximately 2,059 nutritiously prepared mess[]hall meals over a time span of 22 months, causing [plaintiff] to lose a substantial amount of [weight], (suffering) stomach pains, headaches, dizzy spells, lack of energy and motivation, breaking out with rashes and depression[.]" Am. Compl. at 30 ¶ 118; see Dkt. No. 115-1 at 16. Plaintiff asserts that C.O. Bogardus and C.O. Kaiser were also aware of plaintiff's confinement, because they observed plaintiff "not coming out [of his] cell" and, contends—for the first time in opposition to defendants' motion— that C.O. "Bogardus[] state[d] to [C.O.] Kaiser," "[w]hen he's hungry enough, he'll come out of his cell the way we told him." Dkt. No. 115-1 at 16.

First, as discussed in detail above, the record evidence establishes that plaintiff remained in his cell and did not attend meals at the mess hall based on his own preference to avoid checkpoints and sitting at the mess hall tables, and his refusal to wear his hair in a compliant manner.  See subsection IV.C.1.a, supra.  Further, even assuming that plaintiff lost weight, experienced dizzy spells, and experienced stomach pains, headaches, and lack of motivation and energy, such allegations are insufficient to establish an Eighth Amendment conditions of confinement claim because they do not demonstrate a "sufficiently serious condition."  Evans, 2009 WL 1401645, at *10 ("[E]ven assuming that [p]laintiff lost thirty pounds and experienced dizziness and headaches over a four-month period . . . 'there is no evidence in the record from which a reasonable factfinder could conclude that plaintiff's . . . weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation.'") (quoting Bost v. Bockelmann, No. 9:04-CV-246 (GLS/DEP), 2007 WL 527320, at *8 (N.D.N.Y. Feb. 20, 2007)).  Plaintiff's claim that the alleged deprivation of food caused him to break out and develop a rash, see Am. Compl. at 30 ¶ 118, is wholly conclusory, unsupported by any facts or evidence contained in the record on summary judgment, and not elaborated on whatsoever by plaintiff in his pleadings.[12]  In any event, even if plaintiff could satisfy the objective element, he has not established that C.O.s Savage, Bogardus, and Kaiser "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious . . . harm [would] result" to plaintiff.  Salahuddin, 467 F.3d at 280 (citation omitted).  Defendants have submitted admissible documentary evidence to establish that C.O.s Savage,

---

[12]  The undersigned will address plaintiff's contention that that the alleged confinement exacerbated his mental health conditions below in subsection IV.C.2.a.ii., infra.

Bogardus, and Kaiser did not confine or deny plaintiff meals.  <u>See</u>  Dkt. No. 109-15 at 2 ¶¶ 10, 12; Dkt. No. 109-16 at 2 ¶¶ 10, 12; Dkt. No. 109-20 at 2, 3 ¶¶ 9, 13; Dkt. No. 109-14 at 3 ¶ 12, 27; Dkt. No. 109-8 at 37, 48, 82-84.

Plaintiff's contention that C.O. Bogardus and C.O. Kaiser observed plaintiff "not coming out [of his] cell" to go to the mess hall fails to establish that these defendants intentionally disregarded a risk of significant harm to plaintiff.  <u>See</u> <u>Farmer</u>, 511 U.S. at 837 ("[T]he [defendants] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.").  The inmate declarations plaintiff proffers in opposition fail to raise a genuine issue of fact as to the mental states of C.O.s Savage, Bogardus, and Kaiser, as those declarations establish only that plaintiff remained in his cell because he did not want to comply with DOCCS grooming and hairstyling policies.  <u>See</u> Dkt. No. 115-1 at 2-28.  Moreover, none of the inmate declarations name C.O. Bogardus or C.O. Kaiser. <u>See</u> <u>id.</u>  In addition, plaintiff's belated and self-serving allegation that C.O. Bogardus told C.O. Kaiser that plaintiff would "come out of his cell the way we told him" "[w]hen he's hungry enough," Dkt. No. 115-1 at 16, is insufficient to raise a genuine issue of material fact.  <u>See</u> <u>Zembko v. Northwestern Mut. Life Ins. Co.</u>, No. 3:05-CV-918 (AHN), 2007 WL 948323, at *4 n.1 (D. Conn. Mar. 26, 2007) ("[A] nonmovant's self-serving conclusory statements that dispute the movant's evidence cannot create material issues of fact to avoid summary judgment." (internal quotation marks and citation omitted)).

### ii. Deliberate Medical Indifference

Plaintiff alleges that C.O.s Savage, Bogardus, and Kaiser deprived him of adequate medical care by preventing him from attending mental health callouts, which he contends exacerbated his mental health issues and caused him to "mutilate himself." Amen. Compl. at 21 ¶ 84.  Plaintiff also posits that he cut himself in front of C.O.s Bogardus and Kaiser, and that both of them "left without getting plaintiff any medical and mental health treatment."  Id. at 21 ¶¶ 81, 82.

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'"  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle, 429 U.S. at 104).  Non-medical personnel may only be held liable for deliberate indifference to medical needs upon a showing that they intentionally denied or delayed a plaintiff's access to medical care or intentionally interfered with medical treatment once it was prescribed.  See Banks v. No. 8932 Corr. Officer, No. 11-CV-8359 (LAP), 2013 WL 673883, at *4 (S.D.N.Y. Feb. 25, 2013) ("A prison guard's deliberate indifference to a serious medical need of a prisoner means intentionally denying or delaying access to medical care or intentionally interfering with medical treatment once it was prescribed."); Davidson v. Scully, No. 83-CV-2025, 1994 WL 669549, at *12 (S.D.N.Y. Nov. 30, 1994) ("Evidence of deliberate indifference may be found in: a lengthy delay in arranging for medically indicated treatment for a prisoner's serious medical problem, . . . deliberate interference with a prisoner's prescribed treatment, . . . the refusal of prison officials to provide necessary medical care as punishment for misconduct unrelated to the prisoner's medical condition, . . . and a serious failure to provide needed medical

attention when prison officials are fully aware of that need . . . .") (internal quotation marks and citations omitted).

As an initial matter, plaintiff's diagnosis of antisocial personality disorder does not constitute a "serious medical illness." McEachin v. Faruki, No. 9:03-CV-1442 (LEK/DRH), 2006 WL 721570, at *3 (N.D.N.Y. Mar. 20, 2006) ("[The plaintiff] fails to demonstrate that he suffered from a serious medical need. Although [the plaintiff] was diagnosed with antisocial personality disorder, this condition does not constitute a serious medical illness.") (citation omitted). Further, as discussed exhaustively above, even if plaintiff's diagnosis constituted a serious medial illness, the admissible evidence establishes that C.O.s Savage, Bogardus, and Kaiser did not prevent him from requesting or going to medical call outs, as plaintiff was never under any disciplinary sanction or order that required him to stay in his cell. See subsection IV.C.1.a, supra. Moreover, plaintiff's medical records indicate that, although sometimes requiring rescheduling, he did attend his monthly mental health therapy appointments with Dr. McCloskey and his quad-annual appointments with Psychiatric Nurse Practitioner Meyers. See Dkt. No. 109-10 at 59-68, 73-76; 77-88, 90-98. Indeed, plaintiff's July 2017 therapy progress notes, authored by Leta Luguri, Psychologist II at CNYPC ("Luguri"), stated that, "review of [plaintiff's] record indicate[d] that he ha[d] been mostly compliant with MH call outs." Id. at 109, 111. In addition, defendants' admissible evidence establishes that plaintiff's mental health status did not deteriorate during the relevant time period, as evidenced by his numerous progress notes that indicate that plaintiff was, at worst, "mildly depressed" or "mildly anxious,' which he reported as being "due to incarceration." Id. at 83; see id. at 77, 87, 92, 94. However, as Dr. McCloskey

explained, plaintiff did not exhibit symptoms of "major mental illness such as . . . major depression." Id. at 3 ¶ 10.  Indeed, plaintiff's medical records indicate that he consistently "den[ied] any psychotic symptoms and none were observed." Id. at 77, 79, 81, 83, 87, 91, 92, 94, 96; see id. at 97, 101, 102, 103, 104, 107, 109, 111.  In any event, C.O.s Savage, Bogardus, and Kaiser deny having any knowledge of plaintiff's mental health diagnosis, such that plaintiff cannot establish that any of these defendants were deliberately indifferent in that they "knew of and disregarded [plaintiff's] serious medical needs." Chance, 143 F.3d at 703; see Dkt. No. 109-15 at 2 ¶ 13; Dkt. No. 109-16 at 2 ¶ 13; Dkt. No. 109-20 at 3 ¶ 14.

       With respect to plaintiff's allegations that he cut himself in front of C.O.s Bogardus and Kaiser, and that those defendants failed to obtain medical treatment for him, the record evidence establishes only that, on April 14, 2016, plaintiff "report[ed]" to Dr. McCloskey, that "three to four weeks ago he cut his wrist and arms, not deeply, did not need or receive Medical Dept. treatment." Dkt. No. 109-10 at 91.  However, plaintiff's March 8, 2016 progress note authored by Lugri did not indicate any such behavior.  See id. at 89.  Further, C.O. Bogardus and C.O. Kaiser deny having any recollection of plaintiff cutting himself, and plaintiff's medical records are devoid of any mention of these defendants in relation to such an incident.  See id.; Dkt. No. 109-15 at 2 ¶ 14; Dkt. No. 109-16 at 2 ¶ 14.  In any event, as stated above, contrary to plaintiff's allegation, plaintiff's medical records indicate that he did not require medical attention for his purported self-cutting.  See Dkt. No. 109-10 at 91.  Plaintiff's inmate declarations fail to raise a genuine issue of fact in opposition, as none of those declarations name C.O. Bogardus or C.O. Kaiser; rather, the inmate declarations only vaguely attribute the

purported failure to obtain medical treatment for plaintiff's self-cutting to an "officer Nelson," Dkt. No. 115-3 at 18, 19, or unnamed "guards." Id. at 23. Consequently, it is recommended that plaintiff's Eighth Amendment deliberate medical indifference claims against C.O.s Savage, Bogardus, and Kaiser be dismissed with prejudice as without merit.

### b. OMH Defendants

Insofar as plaintiff contends that OMH defendants failed to provide him with adequate or appropriate mental health treatment, his claim is belied by defendants' admissible evidence. First, Dr. McCloskey declared that "[p]laintiff did not, during the time [he] provided [plaintiff] with therapy, exhibit any symptoms that would have lead [him] to believe that [plaintiff] was suffering from a major mental illness." Dkt. No. 109-10 at 3 ¶ 11. Further, based on plaintiff's "primary diagnosis of antisocial personality disorder," OMH defendants provided plaintiff with monthly therapy sessions with Dr. McCloskey, supplemented by four annual visits with N.P. Meyers, and further therapy as needed. See Dkt. No. 109-10 at 2-3 ¶¶ 9-10. Dr. McCloskey explained that "[t]his is the basic standard of care to be provided to mental health patients," such as plaintiff, who do not suffer from "a major mental illness." Dkt. No. 109-10 at 2-3 ¶ 10; see id. at 3 ¶ 11. Similarly, N.P. Meyers explained that, as part of plaintiff's treatment plan for managing his antisocial personality disorder, she evaluated plaintiff's medication needs once every three months, which she states "is the basic standard of care to be provided to mental health patients without a major mental illness." Dkt. No. 109-18 at 2 ¶ 11. In addition, both Dr. McCloskey and N.P. Meyers declared that, based on plaintiff's

diagnosis and symptoms, ICP and TrICP were not appropriate for plaintiff, as those programs "are for inmate patients with more severe mental health treatment needs than those displayed by [p]laintiff or for inmate patients that require more assistance to adjust to the environment of prison general population than [p]laintiff required."  Dkt. No. 109-10 at 6 ¶ 34; Dkt. No. 109-18 at 5 ¶¶ 20-22.  In any event, although Dr. McCloskey and N.P. Meyers had the ability to recommend ICP or TrICP in appropriate cases, neither had the ability to unilaterally place plaintiff in such a program.  See Dkt. No. 109-10 at 6 ¶ 36; Dkt. No. 109-18 at 5 ¶ 23.  Moreover, Bernstein, McCulloch, and Steed, who reviewed plaintiff's grievances concerning his desire to be placed in TrICP or ICP, concluded that "the mental health treatment being provided by OMH was clinically appropriate and in accordance with the relevant policy."  Dkt. No. 109-11 6 ¶ 23; Dkt. No. 109-17 at 4 ¶ 19; Dkt. No. 109-12 at 4 ¶ 19.  Thus, to the extent that plaintiff contends that his treatment plan, therapy schedule, and lack of placement in ICP or TrICP was improper, plaintiff's argument amounts only to a disagreement with medical treatment—an insufficient basis to establish an Eighth Amendment violation.  See Benitez v. Parmer, 654 F. App'x 502, 505 (2d Cir. 2016) (summary order) ("'It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.' (quoting Chance, 143 F.3d at 703)).

To the extent that plaintiff contends that his medical records establish that he has a history of suicide attempts and self-harming behavior such that he suffers from more severe mental health issues than explained by Dr. McCloskey and N.P. Meyers, his

records make clear that he "does not endorse a history of suicidal behavior but does have a history of expressing suicidal ideation/intent/plan, typically superficially for secondary gain.  Record reflects that he has a [history] of threatening self harm in an attempt to delay/impact transfer."  Dkt. No. 109-10 at 37.  Said another way, plaintiff's medical records indicate that he has a history of threatening to harm himself in order to get his own way, and plaintiff fails to proffer any evidence to establish that he suffers from more serious mental health issues than those opined to by Dr. McCloskey and N.P. Meyers and supported by his medical records.  Moreover, insofar as plaintiff alleges that the OMH defendants failed to refer him to the Great Meadow C.F. medical department, Dr. McCloskey's, Meyer's, Steed's, McCulloch's, and Bernstein's declarations establish that "[p]laintiff had the ability to request a medical call out and did not require a referral from OMH staff."  Dkt. No. 109-10 at 6 ¶ 38; Dkt. No. 109-18 at 5 ¶ 25; Dkt. No. 109-12 at 4 ¶ 18; Dkt. No. 109-17 at 4 ¶ 18; Dkt. No. 109-11 at 6 ¶ 22.

In addition, as plaintiff has alleged only that Sullivan failed to respond to his complaints regarding the OMH, the record evidence establishes that Sullivan referred plaintiff's complaints—per OMH policy and procedure—"to OMH Risk Management for investigation and reply."  Dkt. No. 109-22 at 2 ¶ 5.  Therefore, as Sullivan explained in her declaration, she "has no personal role in addressing or answering complaints filed by OMH patients or inmate patients" and "did not review [p]laintiff's OMH complaint, investigate the allegations made therein, or review the findings or conclusions made by other OMH personnel regarding the said allegations."  Id. at ¶¶ 6, 7.  Consequently, as discussed above, plaintiff has failed to establish Sullivan's personal involvement in any Eighth Amendment violation.  See subsection IV.B.1, supra.  Plaintiff's conclusory

statements and general denials asserted in opposition fail to overcome defendants'
documentary case establishing entitlement to summary judgment as to plaintiff's Eighth
Amendment medical indifference claims asserted against the OMH defendants.  See
Dkt. No. 114 at 3 ¶¶ 1, 2, 3, 5, 6; Dkt. No. 119 at 7-8.

### D. Plaintiff's Rule 56(d) Request to Reopen Discovery (Dkt. No. 114)

Although plaintiff labels his motion as being made pursuant to Fed. R. Civ. P.
56(f), which he states was "formerly known as Rule 56(d)," id. 114 at 2, it appears that
plaintiff has merely reversed the sequence of the 2010 Amendment, pursuant to which
"Subdivision (d) carrie[d] forward without substantial change the provisions of former
subdivision (f)."  FED. R. CIV. P. 56, Advisory Committee Notes to 2010 Amendment of
Subsection (d).  Indeed, plaintiff requests that the Court "set aside [d]efendants [sic]
Summary Judgment Motion that pertains to OMH [d]efendants," because he is "ill
prepared to defendant against them due in part, to the complex issues, the multi-faceted
entities that [he is] against," including "OMH, CNYPC, DOCCS, GMCF's MHU, and
GMCF," which he states "each [has its] own Rules & Regulations, and Policies and
Procedures)," and because plaintiff is "a layman to the law and this field of study."  Id. at
14 ¶ 49.  In particular, plaintiff argues that the Court's dismissal of Corey Jackson as a
defendant in this action was premature because "documents would later show that he
was more personally involved than previously thought[.]"  Id. at 3 ¶ 7.  In addition,
plaintiff states that he requested, but was denied, "a complete copy of [his] OMH
records," id. at 3 ¶ 4, which he states is necessary for him to determine whether
defendants afforded him adequate mental health treatment.  See id. at 5 ¶ 14.  Thus,

the undersigned will assess plaintiff's requests in this regard as seeking a stay and to supplement the summary judgment record and to reopen discovery as to his claims against the OMH defendants pursuant to Rule 56(d).

Fed. R. Civ. P. 56(d) permits the Court to, among other things, delay consideration of a summary judgment motion and reopen discovery if a "nonmovant," such as plaintiff, "shows by affidavit . . . that, for specified reasons, [he] cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d).  The Second Circuit has established a four-part test for [assessing] the sufficiency of [the] affidavit": the "affidavit must include [1] the nature of the uncompleted discovery; [2] how the facts sought are reasonably expected to create a genuine issue of material fact; [3] what efforts the affiant has made to obtain those facts; and [4] why those efforts were unsuccessful." Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994).  "Even if the declaration satisfies the four requirements, this Court may deny a request for 'cumulative' or 'speculative' discovery materials, or a request based solely on 'bare, generalized assertions.'"  Desrameaux v. Delta Air Lines Inc., No. 2:15-CV-347 (CBA/VMS), 2018 WL 1224100, at *6 (E.D.N.Y. Mar. 8, 2018) (quoting Alphonse Hotel Corp. v. Tran, 828 F.3d 146,151-52 (2d Cir. 2016).  The decision whether grant relief pursuant to Rule 56(d) is within the discretion of the district court.  See Crye Precision LLC v. Duro Textiles, LLC, 689 F. App'x 104, 106 (2d Cir. 2017) (summary order) (citing Alphonse Hotel Corp., 828 F.3d at 151).

Although Plaintiff has filed an affidavit attempting to comply with Fed. R. Civ. P. 56(d), that affidavit fails to show his entitlement to the requested relief.  First, plaintiff contends that he needs "a complete copy of [his] OMH records," id. at 3 ¶ 4, so that he

can assess whether the OMH defendants provided him with adequate mental health care.  See id. at 5 ¶ 14.  However, as plaintiff acknowledges, see id. at 5 ¶ 8, in ruling on his first motion to compel (see Dkt. No. 60) the undersigned denied plaintiff's request for his entire medical record, which plaintiff explained dated back to the beginning of his incarceration in 2000, as irrelevant.  See Dkt. No. 75 at 15.  Furthermore, plaintiff concedes that he was "provided with [his medical] documents from the time he was housed in [Great Meadow C.F.]"  Dkt. No. 114 at 5 ¶ 8.

In his Rule 56(d) affidavit, plaintiff now avers that he requires his medical records before June 2015 because his "entire file was reviewed by . . . [Dr.] McCloskey, Meyers, McCulloch, Bernstein, and Steed" and his "history, in its totality was a key component that they had taken into account when providing treatment."  Dkt. No. 114 at 5 ¶ 8.  Therefore, plaintiff posits, "because [he] do[esn't] know what was contained in the file that these [d]efendants were utilizing to treat [him], [he is] unable to adequately and fairly assess what they knew about [him] prior to treating him."  Id.  Plaintiff also insinuates that his records before June 2015 will demonstrate that, contrary to Dr. McCloskey's and Meyer's professional assessments, he had a "serious behavioral/personality illness that made [him] eligible" for TrICP or ICP, and that defendants should have known that "[l]eaving him in [his] cell" would cause him to "act out, i.e. mutilate [himself] in order to effectuate a transfer[.]"  Id. at 9 ¶¶ 22, 24.

Plaintiff is incorrect that Dr. McCloskey and Meyers assessed plaintiff's mental health status based on his records prior to June 2015; rather, Dr. McCloskey and Meyers both state in their declarations that, "[p]laintiff did not, during the time I provided him with therapy, exhibit any symptoms that would have lead me to believe that he was

suffering from a major mental illness."  Dkt. No. 109-10 at 2 ¶ 8; Dkt. No. 109-18 at 3 ¶

12.  Dr. McCloskey began treating plaintiff as his therapist on June 15, 2015, and N.P.

Meyers began treating plaintiff on April 27, 2016.  See Dkt. No. 109-10 at 3 ¶ 13; Dkt.

No. 109-18 at 3 ¶ 13.  Further, Dr. McCloskey and Meyers both state that they based

their declarations on their "personal knowledge and review of the records kept in the

usual course of business by [OMH]," and indicate that the records relevant to the

present motion are "[p]laintiff's mental health records from June 2015 through July

2017," which are attached as exhibit A to Dr. McCloskey's declaration.  Dkt. No. 109-10

at 1, 2 ¶¶ 2, 8; Dkt. No. 109-18 at 1, 2 ¶¶ 2, 8.  Insofar as plaintiff avers that medical

records pre-dating June 2015 are relevant to establish his weight for purposes of his

medical indifference claim, as discussed above, even taking plaintiff's allegations

concerning his weight loss as true, his claims lack merit.  See subsection IV.C.1.a,

supra.  Thus, plaintiff has again failed to establish the relevance of any medical records

pre-dating June 2015.  To the extent plaintiff wished to refute any of the OMH

defendants' mental health assessments based on DOCCS records from plaintiff's

incarceration at Great Meadow C.F., plaintiff has had those documents in his

possession since at least March 2020, and, therefore, cannot contend that he was

unable to defend against them.  See Dkt No. 75 at 14-15.  Plaintiff's remaining

contention that the medical records he received were "saturated with inconsistencies" is,

as defendants aver, unsupported by any facts or evidence.  Dkt. No. 114 at 5- ¶ 9; Dkt.

No.118 at 10.

The undersigned reaches the same conclusion insofar as plaintiff avers that

documents revealed through discovery show that previously dismissed defendant

Jackson was personally involved and, therefore, "dismissed prematurely." Dkt. No. 114 at 3 ¶ 7. Plaintiff refers to certain email correspondence between Jackson and Bernstein, which he states shows that "Bernstein [was] looking to . . . Jackson . . . for his template in order to rubber stamp" Bernstein's response to plaintiff's OMH complaints, "which was the same rubber stamp used by McCulloch[] and Steed." Id. at 13 ¶ 45. Plaintiff also states that "[d]iscovery would later reveal that [Jackson] was receiving [h]is complaints and those written on [his] behalf, but was intentionally evading [plaintiff] while making ghost decisions . . . denying [p]laintiff treatment." Id. at ¶ 46 (parenthesis omitted). Finally, plaintiff states that Jackson failed to intervene to provide mental health treatment for plaintiff despite "walk[ing] to any block [plaintiff] was in, . . . and see[ing] [plaintiff] in whatever cell [he] was occupying . . . [and] being aware of the ongoing problem, and the alleged harm it was causing [plaintiff]." Id. at 13-14 ¶ 47. To the extent that plaintiff seeks to aver that the Court previously erred in dismissing Jackson as a defendant, he has not established that he is unable to "present facts essential to justify [his] opposition" to defendants' motion for summary judgment. FED. R. CIV. P. 56(d). In any event, as discussed in detail above, defendants have established that plaintiff received adequate medical care and that plaintiff's claims against the OMH defendants amount to, at most, disagreement with the course of his medical treatment—an insufficient basis to establish an Eighth Amendment claim. See Subsection IV.C.2.b., supra. Therefore, the undersigned concludes, email correspondence between Jackson and Bernstein—which was available to plaintiff to rely on in opposition to defendants' motion—does not raise any question of fact with respect to plaintiff's meritless Eighth Amendment medical indifference claims asserted

against the OMH defendants.  Consequently, plaintiff's motion pursuant to Fed. R. Civ. P. 56(d) to reopen discovery is denied.

## V. Conclusion

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 109) be **GRANTED IN ITS ENTIRETY**, and it is further

**RECOMMENDED**, that plaintiff's Amended Complaint (Dkt. No. 12) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is further

**ORDERED**, that plaintiff's motion to reopen discovery pursuant to Fed. R. Civ. P. 56(d) (Dkt. No. 114) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72.[13]

Dated: July 22, 2021

---

[13] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

Albany, New York

Christian F. Hummel
U.S. Magistrate Judge